NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SUTHERLAND LUMBER COMPANY,
Inc., Respondent.

No. 18932.

United States Court of Appeals,
Seventh Circuit.

Nov. 16, 1971.

Rehearing Denied Dec. 14, 1971.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Avrum Marcus Goldberg, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, William F. Wachter, Susan J. Sherman, Attys., N. L. R. B., for petitioner.

Robert C. Canfield, Carl E. Enggas, Allan L. Bioff, Kansas City, Mo., for respondent; Watson, Ess, Marshall & Enggas, Kansas City, Mo., of counsel.

Before KILEY and FAIRCHILD, Circuit Judges, and CAMPBELL, Senior District Judge.[1]

FAIRCHILD, Circuit Judge.

This is an application by the National Labor Relations Board for enforcement of an order against Sutherland Lumber Company, Inc. The Board found that Sutherland engaged in an 8(a)·(1) unfair labor practice (coercive interrogation and threats); 8(a)(3) and (1) unfair labor practices (discharges of Storkman and Miller); and an 8(a)(1) unfair labor practice by discharging Blake, Goodman, Milliken, Small, and Smith for participating in protected, concerted activities.

1. Honorable William J. Campbell, Senior District Judge, Northern District of Illinois, is sitting by designation.

The Board adopted the trial examiner's decision and recommendations with one modification.[2]

Sutherland operates a number of lumber yards. This case involves its cash and carry retail yard at Indianapolis. A union organizing effort began in April, 1968. A representation petition was filed, and a letter sent to Sutherland on May 14, 1968. The petition was withdrawn June 7. The instances of activity found to be coercive took place in April, May, and June. Storkman was discharged around May 26, Miller June 18, and Blake and the others June 24. Paisley was yard manager, Cornwell and Iverson were found to be supervisors, and there were 35–40 employees. There is no dispute but that the company was opposed to having a union come in.

■ (1) *Coercive interrogation and threats.* The examiner found, resolving conflicts in testimony on the basis of credibility, that supervisors had a number of conversations with employees concerning the union. Some parts of these the examiner found not to have been coercive. Among those found to be coercive or threatening were the following: Iverson asked Storkman if Storkman "knew anything about this union business." Paisley asked Storkman if Storkman "knew anything about this Union activity" and "who was coming around and having people sign." Cornwell asked Goodman if Goodman had anything to do with the union and whether Goodman knew anyone who did. He asked White and King if they had signed union cards. He asked White a second time. He asked Miller who was pushing the union. He asked Milliken and Small how they felt about the union and asked Milliken to give reasons why the union would be good for the company. Cornwell told Miller it would be bad "moneywise" for both employees and the company. District Manager Gilbreath said in a speech to employees from a number of yards that "no union had ever been allowed in" and that "a yard might close down before the union was allowed in and move out to another city." Cornwell said that if there was picketing " * * * they could just go ahead and close the yard down to keep the union from coming in."

In determining whether the board could properly find that these questions and assertions were coercive, the context must be considered and we "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969).

We conclude that the findings of the board in this respect are supported by substantial evidence in the light of the record as a whole.

■ (2) *Discharge of Storkman and Miller.* Storkman had originally been employed in 1966, although he had left for a time. He received several raises. He was interested in becoming a policeman and in February, 1968 applied for a position on the Indianapolis force. There was a conflict in testimony as to whether he had earlier told Paisley that he thought he couldn't pass the police physical or had more recently told Paisley he had not passed the physical when in fact he had. Storkman signed a union authorization card April 25, and was later questioned about his knowledge of union activity. About May 26, Paisley discharged him, giving him an extra two weeks' pay, saying, as Paisley testified: "We needed men, but if he wanted a job with the police department, that I thought he should have one." The somewhat peculiar character of the reason given tends to support a finding that it was not genuine. The board found that

---

2. 176 NLRB 143. The Board found it unnecessary to determine whether the discharges of the five employees found to have been based on their participation in a protected concerted activity were also in violation of Section 8(a) (3).

Storkman was fired, in part, for refusing to reveal to Paisley who was behind the union movement.

Miller had been employed in February, 1968 and received two raises. On April 25 he signed a union authorization card, and about two weeks later attended a meeting of the local. Cornwell was in the vicinity of the meeting and may well have seen Miller. On June 18, Miller was discharged and told he had missed too many days. He had not reported for work that morning, but came in the afternoon. There was a conflict in testimony whether, as he claimed, he had telephoned to explain the need for his absence. The examiner credited his testimony. His explanations for some six days of absence on earlier occasions had been accepted.

The board found that Miller was dismissed for engaging in union activity and that absenteeism was a pretext.

With respect to both Storkman and Miller, the inference that management knew of their union activity could rest on the small size of the work force[3] and a statement by Paisley that he thought he knew which men were trying to get the union in.

"The abruptness of a discharge and its timing are persuasive evidence as to motivation."[4]

We think there is adequate support for the board's findings.

(3) *Discharge of five employees for taking part in a concerted activity for mutual aid or protection.* On June 21, 1968, Paisley decided to change certain job assignments and to move an employee named Kline from the general yard area into the self-service area. On June 22, Saturday, yard employees Blake, Goodman, Milliken, Small, and Smith learned of the transfer. They felt it was a promotion, although the examiner found it was not. They objected to the choice of Kline, believing that others had greater claim by reason of seniority and merit. They protested to Cornwell and later to Paisley. Paisley discharged them on Monday, June 24. The company reported for unemployment compensation purposes that each was discharged because he "did not like the way the lumber yard was operated." This phrasing suggests the termination was for making objections rather than the manner in which the objections were raised. There was a conflict in testimony as to the reasons orally stated at the time of discharge.

There can be little doubt that the subject of the grievance, the transfer of one of the yard employees to a different job, thought by the employees to be preferable, was a legitimate subject for concerted protest. The company's policy and method in making a choice "bore a reasonable relation to conditions of employment. * * *"[5]

The issue here involves the manner in which the protest was made. Did the employees forfeit the statutory protection by the nature of their conduct, and did the company discharge for the improper conduct?

The meeting of the five employees and Cornwell occurred in the paneling shed. It consumed about one-half hour before quitting time on Saturday. It continued for a time near the office after the shed was closed. The discussion was loud and heated and earthy expressions used. Customers were in the yard and at least one customer came into the shed, although there was testimony that voices were then lowered.

The company claims the dispute was louder, longer, and had more tendency to disrupt business operations than the men admit. It claims that Paisley told each man that he was terminated be-

3. See Angwell Curtain Co. v. N.L.R.B., 192 F.2d 899, 903 (7th Cir., 1951).

4. National Labor Relations Board v. Montgomery Ward & Co., 242 F.2d 497, 502 (2d Cir., 1957), cert. den. 355 U.S. 829, 78 S.Ct. 40, 2 L.Ed.2d 41.

5. G & W Electric Specialty Company v. N.L.R.B., 360 F.2d 873, 876 (7th Cir., 1966), citing N.L.R.B. v. Phoenix Mutual Life Ins. Co., 167 F.2d 983, 988 (7th Cir., 1948).

cause of the disruption and unrest he had caused in the yard and because he had failed to observe a rule requiring that complaints be brought to Paisley.

The examiner found that although the five neglected their tasks for a half hour, they were not engaged in a sit down strike, and were not ordered back to work; that although the company had a rule requiring that grievances be submitted to Paisley, Cornwell entertained the grievance, did not refuse to discuss it, and did not, until later, refer the men to Paisley; that the type of language used was used by others in the yard, including supervisors, and condoned by the company; that the talk did not disrupt business; that the men were discharged for protected activity.

The evidence would have supported findings favorable to the company contentions, but the findings made were supported by substantial evidence in the light of the record taken as a whole.

The order will be enforced.