NEWPORT SHIPYARD, INC.

v.

RHODE ISLAND COMMISSION FOR HUMAN RIGHTS, et al.

No. 82–60–Appeal.

Supreme Court of Rhode Island.

Nov. 27, 1984.

Joseph R. Palumbo, Jr., Palumbo Galvin & Boyer, Middletown, for plaintiff.

Dorothy L. Lohmann, Providence, for defendant.

Cynthia Hiatt, Providence, amicus curiae, Legal Counsel for R.I. Com'n for Human Rights.

## OPINION

KELLEHER, Justice.

We have granted the petition of Stephen Gordon (Gordon) for a statutory writ of

certiorari pursuant to the provisions of the Administrative Procedures Act, G.L. 1956 (1977 Reenactment) § 42–35–16 (1983 Cum. Supp.). The petition was granted by this court to review a judgment of the Superior Court that vacated the findings in the order of the Rhode Island Commission for Human Rights (commission). The commission found that the respondent, Newport Shipyard, Inc. (the Shipyard), had engaged in discriminatory employment practices in violation of G.L. 1956 (1979 Reenactment) § 28–5–7 (1984 Cum.Supp.). We reverse.

Gordon, who is black, had been employed by the Shipyard as a certified welder and shipfitter. He was hired on May 13, 1974, and worked for six months before his employment was terminated by his employer on November 8, 1974. Shortly after he was hired, Gordon completed satisfactorily a standard welder-qualification test. This was apparently the only written or oral evaluation of his work made prior to the time his employment was terminated. The commission found that he had never been warned, either verbally or in writing, that any facet of his work was considered substandard by his employer.

Gordon's employment was terminated on Friday, November 8, 1974, after his having been told by his foreman earlier in the week that he would be fired that Friday for not producing enough work. The Shipyard's "Terminated Employees" form lists as reasons for his termination "too much time late [changed from "off"], little interest in jobs, quality of work poor." In the course of his six months of employment, Gordon was absent six days. The only competent evidence of tardiness in the record is Gordon's testimony that he was late "several times." [1]

On the day of Gordon's termination, two white employees were also fired for somewhat similar reasons, though their records might be considered worse. One man, cited for "too much time off, *No* interest in jobs, quality of work poor," had been absent seventeen days in six months (emphasis in original). The other's termination was due to "too much time off, never called in when absent." He had been absent twenty-three days in a little over four months. The Shipyard retained a fourth white employee, Edmond Girard, who was hired at the same time Gordon was hired. At the time of Gordon's termination, Girard had been absent thirty days. By the time Girard was fired in April of 1975 for excessive time off, he had missed fifty-two days over eleven months of employment and had received two written warnings. His last warning stated: "You will be terminated *Next* violation." (Emphasis in original.)

After his termination, Gordon filed a complaint with the commission alleging that the Shipyard had discriminated against him because of his race. The commission issued a complaint against the Shipyard on November 6, 1975, and held hearings on the matter on May 17 and 24, 1976, and on March 2, 1977.

At the hearings, a coworker of both Gordon's and Girard's and a more skilled welder, testified that in his opinion the relative skill levels of both men were roughly equal, though he gave neither a ringing endorsement.[2] The Shipyard's industrial relations manager testified that at the time Gordon was fired, he as manager was unaware of any problems with Girard's work. He also stated that Gordon's firing was warranted.

---

**1.** Although the Shipyard did furnish what it identified as Gordon's time cards to the board at the hearing, they are indecipherable standing alone, and no one ventured to explain them for the record. In addition, time cards were not included in any other Shipyard personnel file. The record indicates that during the period Gordon worked at the Shipyard, the work force consisted of approximately 150 employees.

**2.** 15. Q: Did you, in the course of your employment with both Mr. Girard and Mr. Gordon, did you notice any difference in the quality of the welding work?
A. Quality wise, I would say both men weren't that good welders. They really didn't get it on too good in welding * * *.

The commission also called as witnesses two of its employees, an investigator and a senior compliance officer. The investigator testified that Girard had been associated with a group of black and white employees whose membership included the foreman. Gordon had not been a member of the group.

The compliance officer, in noting the lack of a personnel policy at the Shipyard, observed:

I found very few procedures by which Newport Shipyard could determine the quality of an employee's work or to discipline him. Every decision was an arbitrary one. For instance, the supervisor would make his decision—it would be based on arbitrary standard for performance. There were no set policies such as the employee who is late four times will be disciplined or whatever. Everything was arbitrary at that time. Everything that he showed me was arbitrary.

The Shipyard's response came from two witnesses: Randolf Fowlkes, a black co-worker of Gordon's, and one of Gordon's supervisors. Fowlkes's testimony revolved around the unacceptability of Gordon's work and personality. He stated, "The only reason that I didn't like working with him was because he had his own way of doing things." He testified that Gordon's work had to be redone and that he had complained to others about its poor quality. He had no knowledge of Girard's work. Fowlkes was of the opinion that Gordon was not the victim of discrimination. On cross-examination, it was revealed that Gordon and Fowlkes had a relationship predating their employment at the Shipyard that included a rivalry over pool shooting and a woman.

The supervisor testified that in comparison with other workers, Gordon was "not as good as the rest of them were * * *. He wasn't any better." Upon being asked to compare Gordon's performance with that of Girard, the supervisor stated that Girard was "different. He seem[ed] to take an interest in the job and he tried." However,

he conceded that Gordon "seemed like he wanted to try." The supervisor also reported that he had discussed Gordon's performance with him "a couple of times" but then responded, "No, I did not" to the question, "Did you ever call him into a room to talk to him about his attitude or his work interest?"

The commission concluded that the Shipyard had discriminated against Gordon because of his race in violation of § 28–5–7. In its decision, the commission stated:

Specifically, the respondent failed to allow the complainant an opportunity for improvement such as was allowed a white co-worker. The benefit of written warnings and an opportunity to improve performance were granted to a white worker, but denied to a black employee.

The commission ordered, inter alia, that Gordon be reinstated with seniority, benefits, bonuses, and cost-of-living increases. It further directed the Shipyard to establish objective standards for evaluating employee performance and to provide for the training of management and supervisory personnel in fair-employment practices.

The Shipyard appealed this ruling to the Superior Court, where on January 25, 1982, judgment was entered for the Shipyard. The trial justice in a bench decision observed that the commission had "strictly disregarded" the testimony of Fowlkes and ruled:

The record does not establish that the practices followed by the employer tended to prove the existence of a predetermined pattern of employment or membership. The Court finds that there is no evidence in the record that the employer discriminated against Stephen Gordon on account of race or color.

From this ruling, Gordon appeals.

The duty of the trial justice reviewing a decision of an administrative agency is governed by § 42–35–15(g). *See Guarino v. Department of Social Welfare*, 122 R.I. 583, 410 A.2d 425 (1980). In addition to admonishing the reviewing court not to reweigh the evidence or substitute its judg-

ment for that of the agency on questions of fact, this section also enumerates the conditions under which a reversal is proper. The court may

> reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

> \* \* \* \* \* \*

> (4) Affected by other error of law;
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Substantial evidence* has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance." *Caswell v. George Sherman Sand & Gravel Co.*, R.I., 424 A.2d 646, 647 (1981).

The trial justice's actions present two issues. They are whether the trial justice erred in requiring Gordon to prove a preexisting pattern of discrimination in order to prevail and whether the trial justice disregarded the statutory strictures placed on his review of the decision of the Human Rights Commission when he determined there existed no evidence in the record to support the commission's finding of discrimination. We respond in the affirmative to both issues.

■ The trial justice's ruling that Gordon's failure to demonstrate a "predetermined pattern of employment or membership" proved fatal to his claim of discrimination is clearly error. Section 28–5–7 states in pertinent part:

> **Unlawful employment practices.**—It shall be an unlawful employment practice:

> (A) For any employer (1) to refuse to hire *any applicant* for employment because of his race or color, religion, sex, handicap, age, or country of ancestral origin, or (2) because of such reasons, to discharge *an employee* or discriminate against him with respect to hire, tenure, compensation, terms, conditions or privileges of employment, or any other matter directly or indirectly related to employment \* \* \*. (Emphasis added.)

This statute, clearly written in the singular, applies to any act of discrimination against "any applicant" or "an employee." According this unambiguous language its plain and ordinary meaning as required by *State v. Byrnes*, R.I., 456 A.2d 742, 744 (1983), the statute unmistakably forbids individual acts of discrimination as well as patterns of discriminatory practice.

■ The trial justice's reliance on the absence of any predetermined pattern of employment practices comes about because of his misplaced reliance on § 28–5–22, which reads:

> **Evidence of predetermined pattern.** —The commission shall in ascertaining the practices followed by the respondent, take into account all evidence, statistical or otherwise, which may tend to prove the existence of a predetermined pattern of employment or membership \* \* \*.

Prejudice is rarely proved by direct evidence. A careful reading of § 28–5–22 reveals a statute whose purpose is merely to enlarge the evidentiary arsenal available to the commission. It establishes that evidence that might otherwise be excluded from the commission's consideration absent an affirmative directive to the contrary is admissible and relevant. It does not add an additional element to the case of an individual alleging an isolated act of discrimination. Consequently, the trial justice mistakenly imposed upon Gordon a burden that was not his.

■ As we turn to the sufficiency-of-the-evidence issue, we believe that in line with our prior holding in *Narragansett Electric Co. v. Rhode Island Commission for Human Rights*, 118 R.I. 457, 374 A.2d 1022 (1977), the trial justice, in considering claims brought pursuant to our chapter 5

of title 28, should have looked for guidance in this sensitive area to decisions of the federal courts in construing Title VII of the Civil Rights Act of 1964. With these guidelines in mind, we now turn to the record.

The federal decisions dealing with interpretation of title VII have established two types of employment-discrimination cases: disparate-impact cases, typified by *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and disparate-treatment cases, represented by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and the line of cases it spawned. Gordon's allegations fall in the disparate-treatment category.

■ In such cases the plaintiff is required to prove a prima facie case consisting of variable elements that once proven by a preponderance of the evidence create an inference of racial animus. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957, 967 (1978); *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677. Fundamentally, the plaintiff must prove that he or she is a member of a class entitled to the protection of title VII and that he or she has been treated differently from other similarly situated employees who are not members of the class. *Potter v. Goodwill Industries of Cleveland*, 518 F.2d 864, 865 (6th Cir.1975).

■ The elements of a plaintiff's case vary with the discriminatory circumstances alleged. In situations in which the plaintiff is alleging a discriminatory termination, the elements required to prove a prima facie case usually include the following: (1) the plaintiff was a member of a racial minority, (2) he was qualified for the job and satisfying its normal requirements, (3) he was discharged, and (4) after his dis-

charge the employer assigned white employees to perform the same work.[3] *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1282 (7th Cir.1977).

In this case, Gordon alleges as his fourth element that a similarly situated white employee was retained in employment, warned of his deficiency, and given an opportunity for improvement that Gordon was denied. *Williams v. City of Montgomery*, 550 F.Supp. 662, 666 (M.D.Ala. 1982).

■ Following the procedures enunciated in *McDonnell Douglas*, once the plaintiff's prima facie case is proven, the employer has an opportunity to rebut the inference of discriminatory motive by producing clear and reasonably specific evidence to the contrary. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207, 218 (1981). The focus then returns to the plaintiff, who must show that the employer's expressed justification is actually a mere pretext for discriminatory employment practices. The plaintiff establishes pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217.

The trial justice ruled that there was "no evidence in the record" that would support Gordon's claim of racial discrimination. In reaching this conclusion, he faulted the commission on three grounds, to wit, its disregard of (1) Fowlkes's testimony, (2) the fact that when Gordon received his termination notice, so did two white employees, and (3) the fact that Girard's subsequent termination was for a reason different from that which led to Gordon's discharge. In taking this approach, the trial justice apparently forgot that the fact-

**3.** *See also Potter v. Goodwill Industries of Cleveland*, 518 F.2d 864, 865 (6th Cir.1975). The plaintiff in that case was required to prove that she is a Negro, that because of her physical disability she needed a stool in order to perform

her job, that she did not always have a stool, and that a white woman who also needed a stool to perform her job was always afforded one.

finding responsibility was vested in the commission.

■ The commission disregarded Fowlkes's testimony on the ground of credibility. In cross-examination a bias was revealed that rendered Fowlkes's testimony suspect; and the commission, which had the opportunity to see and hear Fowlkes on the basis of the cross-examination, was justified in rejecting Fowlkes's appraisal of Gordon's welding skills. In its decision the commission specifically referred to the discharge of two white employees, but the commission could well conclude from the duo's employment records that they and Gordon were nowhere similarly situated. One of the employees, who preceded Gordon to the Shipyard by one day, had an absentee record of seventeen days during a six-month period; the other had a record of twenty-three absences, which occurred in a period of less than five months. Gordon, whose record indicated six absences during the six-month period he was employed, insisted that on each occasion he had telephoned the Shipyard to inform it that he would either be late or not be reporting to work on the day in question. Thus, an analysis of the trio's absentee records clearly indicates that the two white employees had considerably more absences than Gordon and consequently they deserved to be fired. The commission thought very little of the Shipyard's reasons for disciplining its employees in the absence of any evidence of an objective standard for evaluating their performance.[4]

■ In this case, Gordon successfully established a prima facie case of racial discrimination. The record reflects that Gordon passed a standard test for establishing welding competency and that his termination sheet did not reflect "not qualified" as a reason for his termination. In *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013

n.10 (1st Cir.1979), the court stated that for purposes of the plaintiff's prima facie case, "unless the employee's job has been redefined, the fact that he was hired initially indicated that he had the basic qualifications for the job, in terms of degrees, certificates, skills and experience."

The record also reflects substantial evidence that a similarly situated white employee, Girard, was retained by the Shipyard despite a record inferior to Gordon's in many respects. In addition, the record reflects that Girard was issued written warnings of his deviations from accepted standards and so was accorded an opportunity to save his job through improvement. Gordon did not receive similar consideration, but was fired without warnings while performing at a level comparable to Girard's with many fewer absences.

The rebuttal testimony offered by the Shipyard was completely off target. In *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1254 (8th Cir.1981), the court, after noting that evidence in the record indicating that white employees received warnings prior to discharge established a pretext, then emphasized that any discriminatory application of a warning policy by an employer could not be tolerated.

■ The basis articulated for the Superior Court justice's refusal to affirm the judgment of the Human Rights Commission was error as a matter of law. He failed to analyze the case according to the standards enunciated by *McDonnell Douglas Corp.* and its progeny and improperly added an element to Gordon's burden of proof not required by state or federal law. Further discussion of the evidence would serve no purpose. The trial justice clearly mischaracterized the issue before the commission and overlooked both the record as a whole and the highly specific findings of fact made by the commission. In treating

---

**4.** A cloud of uncertainty was cast upon the accuracy of Gordon's time cards. The commission's investigator had testified that when he went to the Shipyard to investigate Gordon's complaint, "there was no record of lateness in Gordon's file." The industrial relations manager produced them at the hearing. The failure to produce the cards in response to an earlier subpoena issued by the commission was described as an inadvertence.

the issue as requiring a determination of whether Gordon's performance provided adequate grounds for his termination, the trial justice failed to grasp that the issue before the commission was not the propriety of the Shipyard's ultimate decision to fire Gordon but the divergent routes taken to accomplish this termination where Gordon and Girard were concerned. The trial justice, like the Shipyard, ignored the absence of any warnings being given to Gordon prior to his discharge.

After examining the record in accordance with the applicable federal and state standards, we find that the Superior Court judgment vacating the commission's order is clearly erroneous and that the evidence adduced before the commission clearly supports its order.

The petition for certiorari is granted, the judgment of the Superior Court vacating the commission's order is quashed, and the papers in the case are remanded to the Superior Court with our decision endorsed thereon.