DECISION
This is an appeal from a January 14, 1991 decision of the Rhode Island Labor Relations Board ("Board"). Jurisdiction in this Superior Court is pursuant to R.I.G.L. 1956 (1993 Reenactment) § 42-35-15.
I
CASE TRAVEL FACTS
A review of the record, which consisted of transcripts from four Board hearings taking place between September 25, 1989 and April 27, 1990, indicates that in July, 1987, Paul Hanlon (petitioner/employee) was hired by the Coventry Fire District as an Ambulance Attendant/Driver Trainee[1] for the town's non-emergency ambulance service. This service was provided pursuant to a contract between the Town of Coventry and the Board of Engineers of the Anthony Fire Department, Coventry Fire District. (Respondent/Employer's Complaint, Exhibit A). The cost of operation was provided by the Town of Coventry. This service provided residents, who needed assistance, transportation to hospitals and doctor's appointments in non-emergency situations. The non-emergency ambulance service was operated by Mr. Hanlon and another Ambulance Attendant/Driver Trainee, Louis Cote. The two attendants worked on a three day rotating schedule Monday through Saturday with one working from 8:00 a.m.-4:30 p.m. and the other working 4:30 p.m.-12:00 midnight. The Ambulance Attendant/Driver Trainee on duty was always accompanied by either a volunteer or a paid fire fighter on these trips.
Prior to the hiring of Paul Hanlon, the non-emergency service operated with Louis Cote as the sole driver. At that time, the service was operational from 8:00 a.m. to 4:30 or 5:00, six days a week. In the spring of 1987, Chief Stanley J. Mruk, Chief Engineer of the Coventry Fire District and Chairman of the Board of Engineers of the Anthony Fire Department, desired to add a second non-emergency ambulance driver because he felt it was a good service and he predicted that demand for the service would increase due to a rise in the number of nursing homes in the town. (Tr. 12/8/89, p. 17). Therefore, at the Coventry Town Council's budget hearings for the fiscal year running from July 1, 1987 to June 30 1988, Chief Mruk requested an increase in order to add another attendant for a second shift.[2] Although, this request was denied, Chief Mruk went ahead and hired Paul Hanlon because he felt this would enable the fire district to obtain additional funds from the Town Council for the next fiscal year. (Tr. 12/8/89, p. 21). The following year Chief Mruk again asked for additional funding from the town in its July 1, 1988 — June 30, 1989 budget, arguing that the district now had an additional ambulance attendant. He was again denied. (Id. at 23). Notwithstanding this refusal, Paul Hanlon continued in his job as Ambulance Attendant/Driver Trainee until his termination the following July.
On June 29, 1989, Paul Hanlon filed a complaint with the State Labor Relations Board charging a violation of R.I.G.L. 1956 (1986 Reenactment) § 28-7-13 and § 28-7-12. In response, the Board issued a Complaint against the Coventry Fire District through its Board Of Engineers consisting of Chief Mruk, Normand Plouffe, John Hartman and John Golomb. Hearings on the Complaint followed on 9/25/89, 11/1/89, 12/8/89 and 4/27/90.
At the first Board hearing, Paul Hanlon testified that in December of 1988 he and certain other employees of the Anthony Fire District instituted a campaign to organize a labor union. (Tr. 9/25/89, Page 11). During this time, Paul Hanlon spoke with employees regarding the union and distributed election signature cards. The actual election was to take place in May 1989.[3] In March of 1988, he spoke personally about the election with Chief Mruk's son, who was a lieutenant in the Anthony Fire District. (Id. at 13). Mr. Hanlon further testified that when Chief Mruk asked about the letter of notification of the election that the Chief had received, he denied knowing anything about it because he "was afraid what happened would happen." (Id. at 14). After the start of the organizational campaign, Paul Hanlon and Chief Mruk no longer discussed current events as they had prior to December, 1988. According to Mr. Hanlon, what was once a tolerable relationship between him and Chief Mruk had deteriorated into a "very poor" one after the May 30, 1989 union election. (Id.). On approximately June 20, 1989, the Chief took John Hanlon outside the fire station to tell him that "there was a financial problem and low activity in the ambulance [and] that they were going to terminate my position. He was giving me my two weeks notice." (Id. at 9). This was followed by a written termination notice on June 26, 1989, effective July 8, 1989 at 4:00, "because of Budgetary Restrictions, Changes in Procedure and a lower Avitivity (sic) level in ambulance runs" (Union's Exhibit #2). The Board found the testimony of this witness to be credible. (Rhode Island State Labor Relations Board Amended Decision and Order at 3.)
Next, Lee Hudson, who was a fire-rescue emergency dispatcher for the Town of Coventry and was also supervised by Chief Mruk, gave testimony regarding anti-union statements made by the Chief. Although Mr. Hudson was not involved in the organizational campaign in the Anthony Fire Department, he was aware of it and was involved in a similar campaign to organize the fire alarm dispatchers. He testified as to a discussion he had with Chief Mruk and John Giblin, former clerk of the Anthony Fire Department, at some point during the winter of 1989. During this conversation, Chief Mruk specifically asked Lee Hudson how he was going to vote on the issue of the fire alarm union and then stated that:
 [T]here would never be an union in the fire alarm, and there would never be an union in the Anthony Fire station. That was ten years ago. They tried to get in eight or ten years, they tried to get in, and he beat the union then, and he'll beat them again; and that if anybody was involved with the union, they could open the door, and they could all walk out together. Those are the words.
(Tr. 9/25/89, p. 31). Lee Hudson also testified that during a subsequent private meeting with Chief Mruk, the Chief indicated that if Hudson demanded a vote on the union election for the fire alarm and voted to turn the election down, the dispatchers would receive a pay increase.[4] (Id. at 32 and 33). The Chief assured him that he would make sure that the town manager went along with it. (Id. at 35). In another incident, Chief Mruk stated that even if the employees voted for the union, he would fight it: "They would have to mortgage their houses to pay for it" . . . "[h]e would break them, because the Anthony Fire District had plenty of money. He had plenty of money." (Id. at 35). Lee Hudson also testified that on another occasion Chief Mruk said that he had "one errand boy ambulance dispatcher and one problem lieutenant, or something like that, that he was going to — you know, there was going to be a problem with, and then right after that Paul was laid off." (Id. at 36). In addition, the Chief told Lee Hudson to leave the Anthony Station on the day of the election and has also told him to leave both times he has been to the Anthony Fire Station since the election. (Id. at 39). In its decision, the Board found Lee Hudson's testimony to be credible and also noted that this testimony was never refuted by Chief Mruk. (Amended Decision and Order, pp. 2 and 3).
The Board also heard testimony from Gary Johnson, an employee of the Coventry Fire District and president of that district's union. Mr. Johnson testified that he had been one of five employees seeking to organize Anthony Fire District and that the people involved were all trying to keep their participation in such activities a secret. (Tr. 11/1/89, p. 5). Their reason for such secrecy was due to the fact that after a previous attempt to unionize the district in 1984, one of the employees lost his job. (Id.) Although the official reason for the employees' dismissal was medical, "[e]veryone thought it was from union activity." (Id. at 18). During this previous attempt to unionize, Chief Mruk had indicated to this witness that "he didn't like unions" . . . "[h]e didn't think the department needed a union." (Id. at 7). Gary Johnson also testified that prior to the May, 1989 union election, Chief Mruk asked him how he was going to vote on multiple occasions, and that the first couple of times, he told the Chief that he was voting against the union because "I was nervous, scared." (Id. at 8). Eventually he told the Chief he wasn't sure how he was going to vote because "I just got to the point where you give them the answer they want to hear, that way they leave you alone." (Id.) During a conversation outside the station just prior to the union vote, Chief Mruk stated to Gary Johnson that he needed loyal members and indicated to an area where Paul Hanlon and two other employees, one of whom was the Chief's son, were cleaning up and said: "There's a couple of vacancies there." (Id. at 12). Later in that conversation, Gary Johnson told Chief Mruk that coercion was against the law, to which the Chief responded that "the district gave him more money to fight it than I have, and it's his word against mine." (Id.
at 14). Gary Johnson also testified that on other occasions Chief Mruk said he felt betrayed by his men regarding the union election and that there would be vacancies if the union vote went through. (Id. at 13). Testimony from this witness also indicated that from 1988 to 1989 the total number of non-emergency ambulance runs decreased by only sixteen calls and that runs from 5:00 p.m. to midnight decreased by twelve calls. (Tr. 12/8/89, p. 6); (Union's Exhibit #3); (Employer's Exhibit #4). The Board found the testimony of this witness to be credible stating "the Board is inclined to believe the testimony of . . . Mr. Johnson." (Amended Decision and Order at 3).
Lonnie St. Jean, a full-time fire fighter for the Coventry Fire District, also appeared before the Board. He testified that at the last monthly meeting of the Anthony Fire District, Chief Mruk discussed the possibility of changing the present 56 hour rotation to a rotation requiring more fire fighters, placing full time employees on the State Pension Plan and hiring two more men. (Tr. 11/1/89, pp. 20-22). The witness agreed that all these measures would likely increase costs to the department.
Joseph Hartman, a member of the Board of Engineers for the Anthony Fire District, gave testimony pertaining to the termination of Paul Hanlon's position. Mr. Hartman's name was signed to the letter which terminated Paul Hanlon. As stated above, the three reasons listed for this action were budgetary reductions, change in procedure and lower activity. (Union's Exhibit #2). After reviewing the termination letter, Mr. Hartman stated to the Board that although the letter gave "a change in procedure" as a reason for the termination, in fact the layoff of John Hanlon itself was causing the procedure change. (Tr. 11/1/89, p. 30). Mr. Hartman also testified that he never saw any information that showed less total runs between this year and last year. (Id. at 62). Finally, he was unable to show the budgetary restrictions in the Anthony Fire District's budget for 1989 or in any other documentation presented by counsel. (Id.
at 36, 56, and 60). Mr. Hartman stated that he had in fact relied on Chief Mruk's analysis in deciding to lay off Paul Hanlon. (Id. at 42). He further testified that at a Board of Engineers' meeting subsequent to Paul Hanlon's termination, Chief Mruk discussed putting employees in the State Pension Plan, changing the work schedule and hiring additional men and admitted that all these measures would increase costs. (Id. at pp. 40-41). Testimony by this witness also indicated that in preparing the district's budget for the 1989 fiscal year, the Board was anticipating increased money from the town in their next budget. Mr. Hartman testified that he did not lay off Paul Hanlon because of union activity. (Id. at 64).
John Golomb, the present clerk for the department, read the minutes of the June 12, 1989 meeting in which Chief Mruk discussed financial shortcomings in the district and his plan to request a higher appropriation from the Town of Coventry at their spring budget meetings. The minutes reflected that if the request was not granted, the night ambulance attendant position would be dropped and seniority would prevail. (Id. at 74). The June 26, 1989 minutes were also read into the record. At that meeting, Chief Mruk announced that because the budget increase was rejected, one ambulance trainee position would have to be dropped and the Board concurred. Mr. Golomb testified that:
 "[T]he Chief, of course, is the professional and the board is not professional, but they do make the determination on the advice of the professional. He's gets(sic) paid to know his business and he knows his business and he does know his business. So the board usually would take the advice of the Chief".
(Id. at 76). Although Mr. Golomb stated that this subject had first been discussed in November of 1988, minutes of this meeting were not taken.
Chief Mruk was the final witness to appear in front of the Board for the respondent/employer. He testified that he has been Chief Engineer for the Fire District for twenty-nine years and that his duties included preparing the district's budget and overseeing the fire and rescue service in the Town of Coventry. The majority of Chief Mruk's testimony before the Board concerned the financial situation of the Anthony Fire District centering on the non-emergency ambulance expenditures. He described in great detail the calculations in each exhibit and the role those numbers played in Paul Hanlon's termination. (Tr. 12/8/89, pp. 58-65). Chief also testified that the savings to the district due to the termination was $7,125. (Id. at 65). When asked whether Paul Hanlon would be reinstated to the position of ambulance attendant if the funds were made available, Chief Mruk responded: "Well, I don't know if I can answer that. Maybe he would, maybe he wouldn't because he'd have to apply and — " (Id. at 69). Chief Mruk stated that he would recommend reinstating the second driver's position if adequate funding were available. (Id.). Although Chief Mruk made a general denial that union activity was not the reason for Paul Hanlon's termination, he never offered evidence to rebut the extensive testimony regarding his deeply rooted opposition to a union. The Board noted this in its decision and stated that they chose to believe the petitioner/employee's witnesses.
On October 31, 1990, after the completion of the hearings, the Board issued its Decision and Order. This was followed by an Amended Decision and Order issued on January 14, 1991,[5] in which the Board concluded that "the Petitioner has proven by a fair preponderance of the credible evidence that an unfair labor practice charge was committed by the Coventry Fire District when it did terminate an employee, Paul Hanlon, for union activity." (Amended Decision and Order at 3). The Board believed that the three reasons given for Paul Hanlon's termination in the letter — budgetary restrictions, changes in procedure and lower activity level — were merely a pretext for unlawful motives. In support of its decision, the Board made the following findings of fact: That Paul Hanlon was employed by the Coventry Fire District as a Fire Fighter/Ambulance Attendant from July, 1987 to July 1989; That such position was permanent in nature; That Paul Hanlon was involved in an activity to help organize a union for the Coventry Fire District; That the Chief of the Fire District at said time indicated to various employees of the Fire District that he was opposed to union organization; That the Fire Chief did coerce and interfer(sic) with the Fire District employees' rights to organize a union; That as a result of Paul Hanlon's union activity, he was terminated by the Fire District on or about July 26, 1989. (Id. at 4). As relief, the Board ordered the employer to cease and desist such anti-union practices, reinstate Paul Hanlon in his prior position and reimburse him for all lost wages and benefits retroactive to the date of his layoff. (Id.). Respondent/employer, Board of Engineers, Anthony Fire Department, Anthony Fire District, appealed the decision of the Board to this Court.
II
Standard of Review
The review of a decision of the Board by this Court is controlled by R.I.G.L. § 42-35-15 which provides for review of contested agency decisions:
 § 42-35-15. Judicial review of contested cases.
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
This section precludes a reviewing Court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact.Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). Therefore, this Court's review is limited to determining whether substantial evidence exists to support the Board's decision. Newport Shipyard v. Rhode IslandCommission for Human Rights, 484 A.2d 893 (R.I. 1984). "Substantial evidence" is that which a reasonable mind might accept to support a conclusion, i.e., more than a scintilla of competent evidence. Id. at 897. This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view evidence differently than did the Agency. Cahoone v. Board of Review of Dept. of EmploymentSecurity, 104 R.I. 503, 506; 246 A.2d 213, 215 (1968));Berberian v. Department of Employment Security, 414 A.2d 480, 482 (R.I. 1980). The Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. CoastalResources Management Council, 434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody v. R.I. Conflict ofInterests Commission, 509 A.2d 453, 458 (R.I. 1986).
III
Rhode Island State Labor Relations Act
R.I.G.L. 1956 (1986 Reenactment) § 28-7-12 states in pertinent part that:
 Employees shall have the right of self organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion from any source.
"Employee" is defined in the Rhode Island State Labor Act at R.I.G.L. 1956 (1986 Reenactment) § 28-7-3 as including but not limited to:
 "[A]ny individual employed by a labor organization; any individual whose employment has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular or substantially equivalent employment; and shall not be limited to the employees of a particular employer unless the chapter explicitly states otherwise. . ."
A discharge or suspension is an unfair labor practice if the employee's protected conduct is a substantial or motivating factor for the action, or is "based in whole or part on antiunion animus." Southwire Co. v. N.L.R.B., 820 F.2d 453, 459 (D.C. Cir. 1987); N.L.R.B. v. Wright Line, 251 N.L.R.B. 1083 (1980), enf'd662 F.2d 899, 902 (1st Cir. 1981), cert. denied, 455 U.S. 989
(1982); N.L.R.B. v. Transportation Management Corp., 462 U.S. 393, 401 (1983). In satisfying the requirements of the Act, the employee has the burden of proving by a preponderance of the evidence that anti-union sentiment contributed to the employer's decision to terminate. The employer then has the burden of proving, as an affirmative defense, that termination would have occurred even in the absence of the unfair labor practice.Director, O.W.C.P. v. Greenwich Collieries, 114 S.Ct. 2251, 2258 (1994); N.L.R.B. v. Transportation Management Corp.,462 U.S. 393 (1983).
Upon a finding by the Board that an employer has or is engaging in an unfair labor practice it must order respondent/employer to cease and desist. In addition, the statute also gives the Board very broad powers in creating an appropriate remedy which include awarding back pay, ordering reinstatement with or without back pay, and ordering placement of the employee on a preferential employee list. R.I.G.L. 1956 (Reenactment 1986) § 28-7-22.
IV
COURT'S REVIEW OF THE CERTIFIED RECORD
In the Board's Amended Decision and Order, dated January 14, 1991, the issue specifically addressed was whether Paul Hanlon was terminated from his employment in the Anthony Fire District because of his union activity. Petitioner/employee had the burden of proving that his termination was motivated, in whole or part, by anti-union animus. Respondent/employer could then escape the consequences of a violation by showing that the termination would have occurred for wholly permissible reasons. If it was found that Paul Hanlon was terminated due to his union activity, Anthony Fire Department would be guilty of an unfair labor practice and the Board could award the relief it found to be appropriate under R.I.G.L. § 28-7-22.
In addressing this issue, the Board, as revealed by the record, focused its inquiry on evidence presented in the hearings as to the motive behind Paul Hanlon's termination. A review of the record clearly indicates that evidence before the Board conflicted as to the motive behind the termination. Petitioner/employee presented extensive testimony of Chief Mruk's anti-union animus and strong opposition to the organization of a union through three witnesses: Paul Hanlon, Gary Johnson and Lee Hudson. This testimony is set out above in detail. (See Case Travel Facts, pp. 3-6) On the other hand, the respondent/employer's evidence, presented principally through Chief Mruk, indicated that budgetary restraints were the main motivation.
The language of R.I.G.L. § 42-35-15 indicates that judgments as to questions of fact are left to the sound discretion of the Board. Only if the Board's factual determinations and credibility judgments in their decision are unsupported by substantial evidence within the record may this Court refuse to accept them.Newport Shipyard v. Rhode Island Commission for Human Rights,484 A.2d 893, 897 (R.I. 1984). After a review of the record and determining that there is substantial evidence to support the Board's factual findings, this Court affirms the Board's decision that Paul Hanlon has proven by a fair preponderance of the credible evidence that an unfair labor practice was committed by the Coventry Fire District when it did terminate him for union activity.
In its decision, the Board found the testimony of petitioner/employee's witnesses relating to Chief Mruk's strong opposition to the organization of a union to be credible:
 Despite the Chief's general denial, the Board is inclined to believe the testimony of Mr. Hanlon, Mr. Hudson and Mr. Johnson which indicates and infers that Mr. Hanlon was laid off for his union activity. The Board believes that the true reason for the termination of said employee was not premised on budgetary constraints as alleged by the Chief; but, in fact, was the result of the Chief's deeply rooted and firm opposition of any organization of same.
(Amended Decision and Order at 3). The Board had before it three different witnesses who testified in detail to multiple anti-union statements by Chief Mruk and other instances where threats and coercion were used by the Chief to thwart organization. This evidence included testimony that the Chief pointed to Paul Hanlon and two other men and stated that after the union election there would be vacancies in the department; a statement by Chief Mruk that Anthony Fire District had plenty of money to thwart any threat by the union; testimony that the Chief indicated to a dispatcher that he would get a raise if he voted against a union; and testimony that the Chief was adamantly opposed to a union. (See Case Travel Facts, pp. 1-6). In addition, Chief Mruk repeatedly asked both Paul Johnson and Paul Hanlon how they planned to vote in the union election. (Id. at 3 and 5). Although such an inquiry is not per se coercion, the Board may properly find there to be a violation of the Act if, within the context of the interrogation, the questions asked appear to have a coercive effect on the employees. N.L.R.B. v.Sutherland Lumber Co., 452 F.2d 67 (7th Cir. 1971). The evidence before the Board indicated that the circumstances surrounding these interrogations were coercive. (See Case Travel Facts, pp. 3 and 5). Based on this testimony, the Board found that "certain employees were afraid of openly supporting the formation of a union for fear of reprisals by the Chief of the Coventry Fire Department" (Amended Decision and Order at 3), and that "[t]he testimony presented by the Petitioner indicates that the Chief of the Coventry Fire District, directly or at the very least indirectly interfered with, restrained, and on occasion, in fact, coerced certain employees to abandon their attempts of union organization." (Id.) These witnesses appeared before the Board at which time it found their testimony to be credible.
The Board then considered the evidence presented by the respondent/employer to rebut this charge of illegal motive. That evidence related to budgetary restrictions, changes in procedure and lower activity and was intended to show a permissible motive behind the termination. This included testimony by Chief Mruk, John Golomb and John Hartman, as well as various exhibits outlining the budget and the records of non-emergency ambulance service. The Board found these reasons for terminating Paul Hanlon to be a mere pretext for an illegal labor practice. There was substantial evidence in the record to support these conclusions by the Board. There was no testimony by Chief Mruk to explain or rebut the testimony of his coercive anti-union actions and statements. The Board noted that the Chief only made a general denial. (Amended Decision and Order at 3). The evidence indicated that procedures changed due to Paul Hanlon's termination, not caused it. Also, lower activity at night in the non-emergency ambulance service was not shown — only sixteen fewer calls occurred from 1988 to 1989. In fact, the service always had a much lower number of runs at night compared to the day, even when Chief Mruk first asked for an increase in that budget. Finally, John Hartman, who was the second Board of Engineer's member to vote for Paul Hanlon's termination, could not explain where the budget showed a need to lay off an employee. Mr. Hartman went on to testify that he had relied on the representations of Chief Mruk in making this decision. After hearing testimony from Chief Mruk regarding budgetary restraints, the Board found that this was not the reason for the termination. (Amended Decision and Order at 3).
The foregoing evidence supports the Board's decision that the Board of Engineers, Anthony Fire Department, Coventry Fire District terminated Paul Hanlon for union activity, in violation of R.I.G.L. § 28-7-12. The Board based its decision on the above evidence on which it could and did find that the Fire Chief was adamantly opposed to the organization of a union, attempted to interfere with such formation and caused Paul Hanlon to be terminated for his involvement in it. The record reflects that the Board was neither clearly erroneous nor arbitrary and capricious in its application of facts in this case to the correct standard of law and in finding that the petitioner/employee did carry his burden of persuasion as to the unfair labor practice and that the respondent/employer did not successfully carry the burden of its affirmative defense.
The respondent/employer argues that the finding of fact that Paul Hanlon was a Fire Fighter/Ambulance Attendant is in error and should be reversed. The petitioner agrees that this was an error and in fact Paul Hanlon's job title was "Ambulance Attendant/Driver Trainee." (Petitioner's Brief, p. 5). The latter was, in fact, the title used in the termination letter. (Union's Exhibit 2). R.I.G.L. § 42-35-15 allows a reviewing court to reverse or modify the decision of an agency "if substantial rights of the appellant have been prejudiced" due to a finding which is clearly erroneous. But, a court should not upset an administrative decision because of an error which is not material, there being room for the harmless error doctrine.Delta Air Lines Inc. v. C.A.B., 564 F.2d 592, 598 (D.C. Cir. 1977). The court should affirm if it appears all the important basic findings made by the Board are supported by substantial evidence. Braniff Airways, Inc. v. C.A.B., 379 F.2d 453, 466 (D.C. Cir. 1967). In this case, the Board's decision is in no way based on the specific title of Paul Hanlon's job. Regardless of the title of Paul Hanlon's job, the Board had before it substantial evidence that he was terminated due to union activity. Furthermore, the duties of his job were understood by the parties and the Board. For these reasons, the Board's finding that Paul Hanlon's job title was "Fire Fighter/Ambulance Attendant" rather than "Ambulance Attendant/Driver Trainee" constitutes harmless error which was not prejudicial to the respondent/employer's rights.
Respondent/employer next argues that Paul Hanlon's position was not permanent in nature and therefore he could be terminated when additional funds were not received from the Town of Coventry. Respondent further argues that even assuming that Mr. Hanlon was an employee at will, Anthony Fire District could fire him for any reason or no reason at all. It is true that an employer may discharge an employee for a good reason, bad reason or even no reason, but only absent a showing of anti-unionmotivation. Southwire Co. v. N.L.R.B., 820 F.2d at 459 (emphasis added). As stated above, a discharge or suspension is an unfair labor practice if the employee's protected conduct is a substantial or motivating factor for the action, or the action is "based in whole or part on antiunion animus." Id.; N.L.R.B. v.Wright Line, 251 N.L.R.B. 1083, enf'd 662 F.2d 899; N.L.R.B. v.Transportation Management Corp., 462 U.S. at 401. After the burden of persuasion that anti-union animus was a motivating factor in the termination has been satisfied, the employer may attempt to prove that the termination would have occurred absent the improper motive. Id., 462 U.S. 393; Director, O.W.C.P. v.Greenwich Collieries, 114 S.Ct. at 2258. This argument by respondent might have been persuasive if the Board had found no anti-union animus existed, but this was not the case. (See
Amended Decision and Order at 3). A reviewing court will not disturb the Board's findings of unlawful motive and discriminatory treatment if "they are supported by substantial evidence on the record as a whole." 29 U.S.C. § 160(f);Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951.),Meco Corporation v. N.L.R.B., 986 F.2d 1434, 1436 (D.C. Cir. 1993). As this Court has found there to be substantial evidence to support the Board's decision, it will not be disturbed.
It should also be noted that respondent/employer's classification of Paul Hanlon as a temporary employee rather than a permanent one, even if it was accurate, has no effect on the Board's decision. To begin with, there was no evidence presented that Paul Hanlon was other than permanent. Furthermore, even if he was temporary, the language of the statute does not require that a person be a permanent employee to be protected under the statute. Rather, "employee" is defined as but is not limited to "any individual employed by a labor organization; any individual whose employment has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice." R.I.G.L. § 28-7-3. It is a well settled rule of law that "[w]hen the language of a statute is unambiguous and expresses a clear and sensible meaning, there is no room for statutory construction or extension, and we must give the words of the statute their plain and obvious meaning." In re AdvisoryOpinion to the Governor, 504 A.2d 456, 459 (R.I. 1986). According to the Board's findings, Paul Hanlon is clearly an individual whose employment ceased because of an unfair labor practice. For these reasons, the Board's finding that Paul Hanlon was a permanent employee was not clearly erroneous or an abuse of discretion.
V
RELIEF
The respondent/employer's last argument involves the relief granted by the Board. That relief included a cease and desist order, reinstatement of the employee to his former position and back pay from the date of termination. The argument is that even assuming an unfair labor practice occurred, the portion of the Board's decision ordering reinstatement and back pay was an abuse of discretion because the evidence presented by Chief Mruk indicated that Paul Hanlon's position was eliminated for economic reasons. Respondent has provided federal case law which states that such an award violates the spirit of the Labor Relations Act because it is punitive rather than corrective in nature where severe economic shortcomings are found to exist. They further argue that it would be unfair to order reinstatement because Anthony Fire District would have to recreate the position. In addition, the order of back pay is challenged because it would cause great economic strain on the budget.
R.I.G.L. § 28-7-22 provides the remedies for violations of the Labor Relations Act. These remedies include, but are not limited to, an award of back pay and reinstatement with or without back pay. The Board is allowed to use the remedies stated in this section as well as any other remedies which will "effectuate the policies of this chapter." R.I.G.L. §28-7-22(b)(1). Rhode Island courts have looked to federal courts for guidance in interpreting the Rhode Island Labor Relations Act. Belanger v. Matteson, 115 R.I. 332, 346 A.2d 124 (1975). In Fibreboard Paper Products Corp. v. N.L.R.B., 379 U.S. 203, 216 (1964), the United States Supreme Court discussed the scope of the Board's power to fashion remedies under the act:
 The Board's [remedial] power is a broad discretionary one, subject to limited judicial review. N.L.R.B. v. Seven-Up Bottling Co., 344 U.S. 344, 346 (1953). "[T]he relation of remedy to policy is peculiarly a matter for administrative competence * * *." Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 194 (1941). . . The Board's Order will not be disturbed "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Elec. Power Co. v. N.L.R.B., 319 U.S. 533, 540 (1943).
The N.L.R.A.'s purpose is remedial and not penal and therefore, "Board orders may not be punitive or confiscatory and must be reasonably adapted to the situation that calls for redress."N.L.R.B. v. Seven-Up Bottling Co., 344 U.S. at 349. But, the Board is not restricted to the record in a particular proceeding in fashioning a remedy but may look to more "cumulative experience." Id.
In the present case, the Board found that Paul Hanlon was terminated for his union activity, an act which constitutes an unfair labor practice. Upon making this finding, the Board had broad discretion in ordering a remedy to correct the unfair labor practice. Reinstatement with back pay is clearly within the Board's power under the Act and is what the Board felt would correct this situation. Although respondent/employer has provided cases in which courts have found that severe economic shortfall and plant shutdowns to be valid reasons not to order reinstatement, it should be noted that the courts in those cases found that severe economic shortfalls existed. In the present case, the Board disbelieved respondent's claim of budgetary restraints. The Board was not persuaded by the fact that theposition was terminated rather than Paul Hanlon merely being fired. The termination of a position rather than a person does not lead to a conclusive finding that economic shortfalls were a motivating factor. Instead, the Board found that the Board of Engineers terminated the position in order to give the appearance of proper motive: "The Board believes that the true reason for termination of said employee's position was not premised on budgetary constraints as alleged by the Chief; but, in fact was the result of the Chief's deeply rooted and firm opposition of any organization of the same." (Amended Decision and Order at 3). Had the Board found the budgetary problems to be genuine, reinstatement may have been inappropriate in this case as well. The Board had before it ample evidence to support this finding: Chief Mruk did not have the funding for the position when he first hired Paul Hanlon; Paul Hanlon's position was not terminated after the first refusal to increase funding by the town council; testimony indicated that Chief Mruk had pointed to Paul Hanlon and two other employees and stated that after the union election there would be vacancies in the department; and Paul Hanlon's termination letter made no mention that he would be taken back if economic conditions improved. Therefore, that finding by the Board is not clearly erroneous or an abuse of discretion.
For the aforementioned reasons, this Court finds the Board's determination that Anthony Fire District committed an unfair labor practice when it terminated Paul Hanlon for union activity is supported by reliable, probative and substantial evidence in the record. The decision of the Board is therefore affirmed. However, with respect to the calculation of back pay, the case is remanded to the Board for a hearing.
Counsel should submit the appropriate judgment for entry.
[1] Although the Board found Paul Hanlon's job title to be "firefighter/ambulance attendant" (Amended Decision and Order, p. 4), the petitioner/employee states in his brief that the actual title was "ambulance attendant/driver trainee" which is the title used in Paul Hanlon's termination letter (Union's Ex. #2).
[2] Although Anthony Fire Department's fiscal year runs from December 1 to November 30 of the following year, the department would receive funds from the town at the beginning of their fiscal year which runs from July 1 to June 30 of the following year.
[3] The election in May was for the purpose of deciding if the Anthony Fire Department employees wanted a union representative.
[4] The fire alarm dispatchers did not need an election because an union had been voted in years before and merely lay dormant.
[5] The original Decision and Order of the Board was amended because of a clerical error as to certain dates.