DECISION
Facts and Travel
At the time of the events in question, Maryanne Marold had been a licensed child-care provider for approximately seven years. In August 1992 Marold's child-care license was suspended on an emergency basis by the DCYF as a result of an allegation made by a child for which Marold had provided day care. The child, Annie,[1] complained that Marold's fourteen-year-old son, Jason Marold, had sexually molested her. The incident, or incidents, were alleged to have occurred not during the usual full-time day care periodically provided to Annie by Marold but during evening hours when Marold was providing additional babysitting services as an accommodation to Annie's mother. Marold was not provided any hearing prior to the suspension which was undertaken on an emergency basis.
The alleged molestation and Maryanne Marold's lack of supervision of a child in her care became the subject of a DCYF protective services abuse and neglect investigation. As a result of that investigation, Jason Marold was determined by the DCYF protective services investigator to have sexually molested Annie on two occasions. The allegation of lack of supervision made against Maryanne Marold was determined to be unfounded. The protective services investigator found that Maryanne Marold had no reason to suspect that her son posed a threat to any child in her care. Both determinations were included in written findings made by the DCYF child protective investigator on September 30, 1992, and which were countersigned by the DCYF supervisor on October 2, 1992.
The initial report of alleged child abuse and final findings were reported to the DCYF Child Abuse and Neglect Tracking System. The CANTS system is a computerized data base which contains information pertaining to complaints or reports of alleged child abuse or neglect and any final findings made by the DCYF upon investigation of those complaints or allegations. The identities of the alleged perpetrators of the abuse or neglect, as well as the identities of the individuals ultimately found by DCYF to have committed the abuse or neglect, are maintained in the system. For the most part the CANTS information is confidential. However, CANTS data base information is available to a large number of state agencies and individuals within those agencies. In addition, individuals seeking employment in the child-care field are required by statute to undergo a CANTS "check" prior to becoming employed in that field. Individuals whose identities are maintained in the CANTS system as perpetrators of a substantiated allegation of child abuse are precluded, by DCYF regulations, from being employed in the child-care field.
In an undated letter, Maryanne Marold requested an immediate hearing on the August 22, 1992 emergency suspension of her child-care license. It appears from the record in this case that at the time she made this request, the abuse and neglect investigation was still pending and that the final written findings had not yet been made. A divisional hearing was held by the DCYF Division of Community Resources on September 11, 1992. On September 14, 1992, Marold was notified by the DCYF divisional hearing officer that the earlier decision on the emergency suspension was being upheld. The notice to Marold required that she claim any appeal of the hearing officer's decision within ten days.
Maryanne Marold's attorney filed the requisite notice of appeal from the divisional hearing officer's decision. The Notice of Appeal is undated, but in the upper-right corner there is a note suggesting it was received by the DCYF on September 18, 1992. In any event, the claim of appeal is quite clear in that the challenged action is the emergency suspension.
On September 20, 1992, Maryanne Marold was advised by the DCYF licensing administrator, Sandra Poirier, that, because of the findings indicated by the abuse and neglect investigation, Marold's child-care license was permanently revoked. Marold had not been afforded an evidentiary hearing prior to this permanent revocation of her license. The September 20, 1992 letter from the licensing administrator advised Marold of her right to appeal the revocation decision.
It was during this period in which the DCYF began the license-suspension proceedings against Maryanne Marold that it also continued with and ultimately concluded its investigation into the accusation against Jason. Inasmuch as a report of child abuse by a caretaker had been made to the DCYF, the DCYF investigated to determine if, indeed, a child had been sexually abused by a parent or other responsible person or if a child's parent or other responsible person had allowed an act of sexual abuse to be committed against the child. The investigation resulted in a determination that the allegation of child abuse, as it is defined for DCYF's purposes, was unfounded. Accordingly, the DCYF reported into the CANTS system both the allegation of child abuse as well as the fact that the allegation was unfounded. The DCYF also undertook to make a separate written finding that Jason Marold had committed an act of child molestation. As set forth above, this determination was made on September 30, 1992, and countersigned by the DCYF supervisor on October 2, 1992. The exact date that the determination was reported into the CANTS system is unknown.
Two critical consequences flowing from the DCYF investigation and final findings are at issue here. First, that Jason was the perpetrator of a substantiated incident of child molestation was reported into the CANTS system. Second, the determination respecting Jason Marold was characterized by DCYF as a finding of abuse or neglect and was used as a basis for the summary and permanent revocation of Maryanne Marold's day-care license under the DCYF regulations concerning child-care providers.
Although Maryanne Marold was notified by the DCYF of its determination that Jason was the perpetrator of a child sexual molestation, that notice was given in the context of her license-suspension process only. Nowhere does the record reflect that Jason Marold was at any time notified by the DCYF of the protective worker's findings, the report of that finding into the CANTS system, or that he had a means by which he could challenge either. But for the action taken against his mother's day-care license and her attorney's exercise of caution in claiming an appeal on Jason's behalf, the finding against Jason Marold might well have gone unnoticed by him and left unchallenged. The facts of this case raise the specter of any number of individuals whose identities may have been reported into the CANTS data base as perpetrators of some act of child abuse but who have never been notified of the action taken against them nor of their opportunity to challenge that action.
On October 2, 1992, Marold's attorney made a formal request for a hearing on behalf of Marold and her son, Jason. The formal request for hearing complained that the results of the investigation were erroneous because:
 "(1) the investigator failed to apply properly the standards of proof required for an indication;
 "(2) the investigator failed to properly follow departmental procedure;
 "(3) the overwhelming weight of the evidence mandates a finding that the accusation is unfounded;
 "(4) Jason has been deprived of his liberty interest in his reputation and clean record without due process of law;
 "(5) the department's procedures, as applied to Jason, are constitutionally defective;
 "(6) the investigator failed to consider properly the interest of Jason;
 "(7) the department has been unfairly influenced and prejudiced by employees with a personal interest in the outcome."
The record reveals that the DCYF, Maryanne Marold, and Jason Marold, each treated the October 2, 1992 Notice of Appeal as a claim of appeal by Maryanne Marold to the permanent license revocation and as a claim of appeal by Jason Marold to the DCYF finding that he was the perpetrator of what is termed an "indicated" sexual molestation.
A prehearing conference was held on November 20, 1992, after a delay initiated by the DCYF. By agreement of counsel, the actual hearings were scheduled to commence on January 21, 1993. That hearing was cancelled, rescheduled, and cancelled again at the request of DCYF. Hearings finally commenced on April 16, 1993.
A transcript of the administrative hearings identifies the proceedings as "In re Maryanne Marold." While the record of the hearings is somewhat confusing, it appears that the DCYF, Jason Marold, and Maryanne Marold, agreed to proceed by hearing Maryanne Marold's appeal of the emergency license suspension and ultimate revocation together with Jason Marold's appeal of the determination that he had committed an act of child molestation. The parties also agreed that should Jason Marold prevail upon his appeal then the department would reinstate Maryanne Marold's license.
The April 16, 1993 hearing transcript contains a dialogue between counsel for the Marolds, counsel for the DCYF, and the hearing officer, Rosalie Bowen. The hearing officer ruled that the Marolds had the burden of going forward with evidence rebutting the DCYF evidence which amounted to a copy of the child protective investigator's investigative reports, summaries, forms, and findings. The transcript also reflects some confusion on the part of the DCYF as to whether or not Maryanne Marold had been afforded a hearing on the permanent revocation of her license prior to that revocation.
After objecting to being saddled with the burden of going forward, the Marolds proceeded by offering the testimony of the child protective investigator who made the determination that Jason Marold had committed an act of child molestation, as well as the testimony of Maryanne Marold, Kenneth Marold, Jason Marold, Doctor Elaine Carlson, and that of a young child who was alleged to have been present in the Marold home at the time of the alleged incident or incidents. The Marolds also attempted to introduce evidence that Annie's mother was involved in a lesbian relationship with a DCYF division chief. That evidence was offered as being relevant to Annie's credibility as well as to plaintiffs' allegations that the investigation had been unfairly influenced by DCYF employees with a personal interest in the outcome. The hearing officer precluded the introduction of that evidence.
The evidence produced by DCYF included the child protective investigator's written reports and notes as well as legal counsel's cross-examination of the Marolds' witnesses.
A review of the hearing transcript reveals that the evidence offered by the Marolds was primarily directed to the merits of the allegations made against Jason. Evidence pertaining to the procedures followed by the child protective investigator in conducting her investigation was produced predominantly by the DCYF.
On December 15, 1994, the DCF hearing officer rendered a written decision. She characterized the issue before her as being solely whether or not the finding of the child protective investigator was supported by credible evidence. She applied DCYF Policy 420 which describes and identifies "credible evidence" as a "standard of proof."
The hearing officer's narrow characterization of the issues before her appears to have resulted from the parties' decision to combine the issue respecting Maryanne Marold's license suspension and subsequent revocation with the issues raised by the child protective investigator's report of her abuse or neglect investigation findings into the CANTS system.
In her decision the hearing officer recounted the hearing testimony but included almost no findings other than ". . . there is sufficient credible evidence to support the findings of child protective investigator Susan Strong-Archer. Specifically the record, evidence presented at hearing and testimony of the child protective investigator in the instant case when viewed in the light of surrounding circumstances, do support a finding of sexual molestation. The record and testimony at hearing do indicate that the investigator, in accordance with DCYF policy continually weighed the reliability of and ascribed importance to each piece of information received during the investigative process." The hearing officer's decision is otherwise devoid of any reference to or findings in respect to the child protective investigator's compliance with DCYF's policies and procedures during the conduct of her investigation. She made no mention of the DCYF procedures for examinations by physicians or of methods of collecting evidence, for example. Likewise, she made no reference to, or analysis of, the departmental Standards for Investigating Child Abuse and Neglect Reports. See 03 040 Code of R.I. Regulations 411.
The hearing officer summarily denied the Marolds' motion for a summary disposition of their appeal. The grounds for the motion included procedural and substantive due process grounds.
On January 19, 1995, the plaintiffs filed a two-count complaint. Count 1 claimed an administrative appeal taken pursuant to the Administrative Procedures Act, G.L. 1956 § 45-35-15. In Count 1 the plaintiffs complained that their substantial rights had been prejudiced because of the findings, inferences, and conclusions which make up the decision of the DCYF and which are:
 "a. in violation of constitutional or statutory provisions;
 "b. in excess of the statutory authority of the DCYF;
 "c. made upon unlawful procedures;
 "d. affected by other error of law;
 "e. clearly erroneous in view of the reliable, probative and substantial evidence of the whole record; or
 "f. arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
Count 2 of the complaint makes allegations of civil rights violations against the DCYF hearing officer, Rosalie Bowen, the child protective investigator, Susan Strong-Archer, and Sandra Poirier, the DCYF licensing administrator. Plaintiffs claim each of the three deprived them of both substantive and procedural due process under color of State law. In addition to the 42 U.S.C. § 1983
claim, Count 2 requests declaratory and injunctive relief. Plaintiffs, among other things, ask the Court to declare the DCYF policies and procedures which led to the report of findings into the CANTS system unconstitutional.
On June 1, 1995, a justice of the State of Rhode Island Superior Court ordered the Count II constitutional claims severed from the Count I administrative appeal. The parties filed their briefs respecting the administrative appeal and the matter was assigned to this justice for review.
The plaintiffs-appellants argue, among other things, that the DCYF finding that Jason Marold committed an act of sexual molestation must be vacated or reversed for the reason that the child protective investigator failed to follow the appropriate departmental policies in the conduct of her investigation. They cite DCYF Policy 007 which specifically sets forth that "at any hearing on a complaint regarding a department's decision that an allegation of child abuse or neglect should be indicated, the official hearing said case must determine whether the child protective investigator complied with all policy and procedure relating to the conduct of such investigations." Plaintiffs further argue that they have been deprived of procedural and substantive due process in several respects.
Jurisdiction and This Court's Review
Although G.L. 1956 § 8-10-3 (e) confers exclusive jurisdiction upon the Family Court of all appeals from any administrative agency affecting or concerning children under the age of eighteen, the instant case is properly before this court. It is true that Jason Marold, one of the parties aggrieved by the hearing officer's decision, is under the age of eighteen. It is also true that the child, Annie, is under the age of eighteen and that the decision of the hearing officer broadly concerns her. The agency decision at issue, however, was unrelated to considerations arising from the minority status of any child, including Jason Marold or Annie. Nor does the agency decision directly relate to a matter of any child's welfare. To construe G.L. 1956 § 8-10-3 (e) as conferring upon the Family Court the exclusive jurisdiction of any administrative appeal so long as that appeal broadly concerns a child would be to reach an absurd result and a result not intended by the Legislature. It is well settled in this jurisdiction that the court must ascertain and give effect to the intent of the Legislature in construing a statute. Sorenson v. Colibri Corp., 650 A.2d 125 (R.I. 1994);Krikorian v. R.I. Department of Human Services, 606 A.2d 671
(R.I. 1992).
This Court's review of a final agency decision is controlled by G.L. 1956 § 42-35-15 (g) which provides for review of a contested agency decision:
 "(g) The Court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 "(1) In violation of constitutional or statutory provisions;
 "(2) In excess of the statutory authority of the agency;
 "(3) Made upon unlawful procedure;
 "(4) Affected by other error or law;
 "(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 "(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact. Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). Therefore, this court's review is limited to determining whether substantial evidence exists to support the Commission's decision. Newport Shipyard v. RhodeIsland Commission for Human Rights, 484 A.2d 893 (R.I. 1984). "Substantial evidence" is that which a reasonable mind might accept to support a conclusion. Id. at 897 (quoting Caswell v.George Sherman Sand Gravel Co., 424 A.2d 646, 647 (1981)). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berberian v. Dept. ofEmployment Security, 414 A.2d 480, 482 (R.I. 1980). This court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal Resources Management Council,434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts.Carmody v. R.I. Conflict of Interest Commission, 509 A.2d at 458. The Superior Court is required to uphold the agency's findings and conclusions if they are supported by competent evidence.Rhode Island Public Telecommunications Authority, et al. v. RhodeIsland Labor Relations Board, et al., 650 A.2d 479, 485 (R.I. 1994).
Questions Presented
1. Do DCYF procedural protections afforded individuals found by the department to have committed an act or acts of child abuse or neglect or other harm to a child contain sufficient constitutional safeguards?
2. Was the suspension of Maryanne Marold's day-care license made upon unlawful procedure?
Discussion
The DCYF was created pursuant to G.L. 1956 § 42-72-1. General Laws 1956 § 42-72-2 declares the policy behind the creation of the department as being, essentially, to promote, safeguard, and protect the social well-being and development of Rhode Island's children through a comprehensive social service program. DCYF is charged with the implementation of the Rhode Island Child Abuse and Neglect Act by providing protective services for children in accordance with G.L. 1956 §42-72-11. See G.L. 1956 § 40-11-1, et seq.
The DCYF enabling act contains the definition of child abuse and neglect, which is the same definition as contained in the Rhode Island Child Abuse and Neglect Act. By definition an act of child abuse or neglect as it is defined in the context of the law creating the DCYF can only be committed by a person responsible for the child's welfare. An abused and/or neglected child means a child whose "physical or mental health or welfare is harmed or threatened with harm when his parent or other person responsible for his or her welfare . . . commits or allows to be committed, against the child, an act of sexual abuse. . . ." General Laws 1956 § 42-72-3 (3) and G.L. 1956 § 40-11-2 (1). A "person responsible for the child's welfare" means the child's parent, guardian, foster parent, and employee of a public or private residential home or facility, or any staff person providing out-of-home care, including family day care, group care, and center based day care. General Laws 1956 § 40-11-2 (1)(j)(9).
The DCYF is also empowered to control and regulate certification and licensing for child-care providers, including family day-care homes. General Laws 1956 § 42-72.4-1, et seq.
Accordingly, it has promulgated regulations which were filed with the Secretary of State on August 8, 1990, and entitled Family Day-Care Certification Regulations. These regulations contain guidelines for the revocation or denial of licensing certification of family day-care homes. Pursuant to the regulations, a day-care certification may be revoked where "The service provider . . . or other permanent member of the provider's household has been indicated for child abuse or neglect."[2] See 03 000 Code of R.I. Regulations 019.
The number of DCYF policies and procedures are voluminous. The DCYF Policy 420[3] is entitled "Standards of Proof" and contains the standards of proof which the DCYF expects will apply at various times during the processes through which it brings and proves allegations against parents and caretakers in child abuse and neglect cases. While Policy 420 directs itself predominantly toward procedures in Family Court proceedings against a parent or other responsible person, section II (A) of that policy contains the level of proof required by DCYF for any finding by a child protective investigator that a report of child abuse or neglect is indicated to be true. A "responsible person" is considered to be "indicated" as having "abused" or "neglected" a child where a DCYF child protective investigator has determined an allegation or complaint of abuse or neglect to be substantiated by "credible evidence." Policy 420 describes and ranks five different "standards of proof" to be followed by the department during various stages of administrative or other procedures. From reading Policy 420, it is clear that the DCYF places its "credible evidence" test somewhere at the bottom of its evolutionary scale of standards of proof and well below its "prima facie evidence" or "reasonable grounds to suspect" tests. Proof by preponderance of the evidence is notably absent from the DCYF list of recognized standards. Policy 420 exposes the DCYF confusion over the concept of standard of proof.
DCYF Policy 007 provides prospective DCYF clients, persons receiving DCYF services, and service providers with a complaint process if any such individual is dissatisfied with departmental decisions. Individuals falling within those categories may make an oral or written complaint with respect to, among other things, placement or removal of children from foster homes, closure of a foster home, other dissatisfaction surrounding services provided by staff, other dissatisfaction with agency rules and regulations, claims of discrimination, and licensing issues. Procedures for processing such complaints are included in Policy 007. The procedure or process contemplates supervisory hearings, divisional hearings, formal hearings, and administrative appeals. Policy 007 also contains specific provisions for hearings on complaints regarding the department's decision that an allegation of child abuse or neglect should be "indicated." Specifically, Policy 007 states:
 "At any hearing on a complaint regarding the department's decision that an allegation of child abuse or neglect should be indicated, the official hearing said case must determine whether the Child Protective Investigator complied with all policy and procedure relating to the conduct of such investigations." See 03 020 Code of R.I. Requlations 007.
A plain reading of Policy 007 reveals that at hearings on complaints regarding a departmental decision that an allegation of child abuse and/or neglect is indicated, the question for determination is whether the child protective investigator complied with the appropriate departmental policies and procedures in making his or her decision. According to the explicit terms of DCYF Policy 007 that determination must be based on clear and convincing evidence. Significantly, Policy 007 does not require that the substance of the allegation of child abuse or neglect be proved. It is only the child protective investigator's process in making the decision which must be proved as having been in compliance with departmental regulations. By its terms, Policy 007 does not apply to individuals such as Jason Marold who are neither DCYF prospective clients, persons receiving DCYF services, or child service providers. Licensing suspension actions taken against child service providers such as Maryanne Marold are, however, within the ambit of Policy 007.
The DCYF has created an Administrative Review Board pursuant to its filings with the Secretary of State dated February 10, 1991. The purpose of the board is to afford certain categories of individuals a hearing on matters relating to the DCYF's function and purpose. Those categories of individuals include children, their families, staff, foster parents, adoptive parents, group home administrators and all other providers of services to children. Referrals to the Administrative Review Board appear to be made for the purpose of allowing an open forum for discussion and not necessarily for the purpose of making a final review of any decision of a DCYF hearing officer. Complaints made to the Administrative Review Board are to be decided "in the best interest of the child." The Administrative Review Board process does not appear to have been intended for individuals such as Maryanne Marold and Jason Marold.
The only DCYF policy or procedure which appears to afford some fashion of process to individuals of Jason Marold's status, i.e., not DCYF clients, child service providers, or persons receiving DCYF services, is DCYF procedure entitled "Non-employee related administrative hearings new procedure effective September 1, 1993." Unfortunately this procedure was not in effect at the time of the DCYF proceedings against Jason. The new procedure provides for appeals to the office of the director from adoption and licensing decisions, as well as from what are referred to as "CANTS decisions." It contains no provisions by which an individual such as Jason Marold is afforded notice of the outcome of a child protective investigation or of the fact that his/her name is reported into the CANTS system, but it does, however, clearly permit a challenge to a child protective investigator's determination. It also requires that a hearing officer's decision be based on clear and convincing proof. The written procedure does not contain language which would advise an individual such as Jason Marold whether the issue for determination by a hearing officer is if the child protective investigator complied with all policy and procedure relating to the conduct of the investigation, as opposed to whether the allegations have merit or are true.
A review of the DCYF policies generally and the record in this case reveal that the DCYF uses the term CANTS to refer to a broad range of its functions in implementing the Rhode Island Child Abuse and Neglect Act. This use of CANTS nomenclature is confusing and more than a little misleading because it blurs the distinction between DCYF child protective services' functions and the maintenance and operation of the child abuse and neglect tracking system data base. The DCYF policies entitled CANTS Policies, for example, contain explanations of procedures relevant to court proceedings, including standards of proof for those proceedings. The policies contain guidelines for assessing a child's risk for being abused or neglected by a parent or responsible person. They contain statements of policy on drug use during pregnancy. They contain procedures relating to runaway children. Protective services investigations are referred to as CANTS investigations. The protective services investigators are referred to as CANTS investigators. Interspersed with the "CANTS" policies and procedures relating to DCYF protective services' functions are procedures for reporting into the CANTS system. The DCYF's tendency to blur the CANTS system with its own child protective functions appears to have contributed to its own confusion of the issues, something which is readily apparent in the instant case.
General Laws 1956 § 40-13.2-1, et seq. is entitled "Certification of Child Care Personnel" and establishes certain criteria for employment in the child-care field. Child care employers and employees are required to submit affidavits to the DCYF providing information relating to individual employment histories. Employees and licensees are required to submit to a criminal records check as well as a CANTS check. The statutory scheme allows the DCYF to disqualify individuals from child-care employment if the CANTS system contains substantiated complaints against those individuals.
In short, the DCYF has the power to investigate allegations of child abuse and to make departmental findings that the allegation is a substantiated one. It records and maintains those findings, disseminates the findings under a variety of circumstances and utilizes those findings to preclude the alleged perpetrators from being employed in the child-care field. The DCYF limits the relief of which an alleged perpetrator may avail himself or herself to an administrative hearing in which the question is the efficacy of the DCYF investigation and not the merits of the allegations themselves. The standard of proof used in the administrative hearing is that there be credible evidence to support the notion that the department followed its own procedures in conducting the investigation.
Analysis
There is no question that in the instant case the DCYF protective services was responding to a complaint which the department had the authority to investigate. That the perpetrator of an act of abuse or neglect may ultimately be determined to be a person not falling within the statutory definition of "responsible person" should not hinder the DCYF's investigative powers so long as the investigation is legitimately instituted. An allegation was made that an act which would amount to abuse or neglect had been committed by Maryanne Marold in that she failed to provide adequate supervision for a child in her care. Therefore, the investigation into both of the Marolds' conduct was lawful under the relevant statutes and statutory definitions, G.L. 1956 § 42-72-5 (b)(3), (5), (8), (12); G.L. 1956 §40-11-1. Likewise, DCYF's report into the CANTS network of the outcome of its investigation was within its authority, notwithstanding that Jason Marold was not a person responsible for Annie's welfare and that, therefore, the statutory criteria for abuse and neglect were not met, G.L. 1956 § 40-11-1, 7; G.L. 1956 § 42-72-4 (B)(10).
The questions presented by this case are, however, unrelated to the DCYF's investigatory and reporting powers. The focal issues are those of procedural and substantive due process.
This court finds the reasoning in Valmonte v. Bane,18 F.3d 992 (2nd Circuit 1994), to be persuasive. In Valmonte the plaintiff brought a claim against the Commissioner of the New York State Department of Social Services over the inclusion of her name on the New York State Central Register of Child Abuse and Maltreatment. Valmonte alleged that the inclusion of her name on what was known as "the Central Register" or "the list" violated her Fourteenth Amendment right of due process. The central issue was whether the state's maintenance of such a list or register which identified individuals accused of child abuse or neglect and its communication of the names of those on the list to potential employers in the child-care field implicated a protectable liberty interest under the Fourteenth Amendment. Also at issue was whether the New York state statutory procedures established to protect that liberty interest were constitutionally adequate. The court in Valmonte held that the dissemination of information from the register to potential child-care employers coupled with the defamatory nature of inclusion on the list did implicate a liberty interest. The court also held that the state's procedures violated due process primarily because the risk of error in evaluating the allegations against those included on the list was too great. Significantly, New York required only that there be "some credible evidence" to support the complaint of child abuse in order to list the alleged perpetrator in the central register. The Valmonte court attributed the high risk of error to the standard of proof required for the initial determination of child sexual abuse and at the non-deprivation hearing. The court specifically held that the "some credible evidence" standard is "especially dubious in the context of determining whether an individual has abused or neglected a child" and that "such determinations are inherently inflammatory, and unusually open to the subjective values of the factfinder." Valmonte at 1004. The court held that a standard of proof such as proof by a preponderance of the evidence must be applied if the procedural protections are to be adequate.
The decision in Valmonte was the product of a line of cases from the United States Supreme Court which held that an individual's good name and standing, and the interest in protecting that reputation, constitutes a liberty interest.Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971); Board ofRegents v. Roth, 408 U.S. 564 (1972); Paul v. Davis, 424 U.S. 693
(1976).
The fact that Jason Marold had a protectable liberty interest at stake is unquestionable. In determining whether or not Jason Marold has been deprived of that interest, this court must consider the stigma associated with having one's name listed in the CANTS system. While the right to an unsullied reputation is guaranteed by the United States Constitution, creation of stigma alone is not enough to implicate the protections of the Fourteenth Amendment Due Process Clause. Paul v. Davis,424 U.S. 693, 708-709 (1976). The Supreme Court has accordingly promulgated a "stigma plus" test whereby a petitioner must establish the existence of both a stigma and some additional harm or invasion before a constitutional deprivation will be recognized. Paul v. Davis, 424 U.S. 693, 708-709 (1976). The additional injury, or "plus" factor, can be found in a variety of interests including the loss of employment, or the lost opportunity in future employment. Lee TT. v. Dowling,664 N.E.2d 1243, 1249 (N.Y. 1996) (citing Davis, 424 U.S. at 701); Valmontev. Bane, 18 F.3d 992, 1001 (2nd Cir. 1994); Doe v. United StatesDepartment of Justice, 753 F.2d 1092, 1106-1107 (D.C. Circuit 1985).
By identifying Jason in the CANTS system as one against whom a substantiated allegation of child molestation has been made, the DCYF has unquestionably stigmatized him. Identifying one as a child molester clearly injures his or her reputation and calls into question that individual's good name, honor, and integrity. Moreover, this court is convinced of additional damage sufficient to satisfy the "plus" requirement of the Davis test.
General Laws 1956 § 40-13.2-3.1, et seq., governs the certification of child-care personnel. Any individual seeking employment in the child-care field must submit to a CANTS check and a criminal records check to determine whether that individual should be disqualified from employment because he or she could endanger the health and welfare of children. General Laws 1956 § 40-13.2-3 4. Potential employers must provide the DCYF with affidavits detailing the prospective employee's employment history. General Laws 1956 § 40-13.2-3 4. Disqualifying information will, by operation of G.L. 1956 § 40-13.2-5, preclude an individual from becoming certified in and working in the child-care field. Employers are required to maintain employment history affidavits on file and risk losing their operating licenses if they fail to do so. General Laws 1956 §40-13.2-5. The inclusion of his name in the CANTS data base necessarily precludes Jason Marold from ever seeking to become certified for employment in the child-care field. Any prospective employer would be obligated to consult the DCYF for a CANTS check prior to hiring Jason. By operation of law, those potential employers would be informed of the DCYF determination that Jason is disqualified from child-care employment, the likely result of which is that these employers will refuse to hire Jason. Significantly, employment will not be refused Jason merely because his reputation has been sullied and he is faced with the intangible and deleterious effects of a simple defamation, but rather because state law imposes on a prospective employer the burden of submitting employment-history affidavits and triggering the CANTS check which will lead to the DCYF informing the employer that Jason is a person who has been disqualified from child-care employment. Thus, it is this tangible burden and specific deprivation of the opportunity to seek employment caused by a statutory impediment which makes the prospect of employment less likely. See Valmonte, 18 F.3d at 1001. Inclusion of Jason's name in the CANTS registry therefore not only harms his reputation but also acts as an impediment precluding him from any future employment in the child-care field. Such circumstances satisfy the "stigma plus" test promulgated in Davis. Id. at 1002.
Two additional requirements remain before the deprivation can be conclusively established. First, there must be publication of the statement in question. Michael R. Phillips, Note, TheConstitutionality of Employer-Accessible Child Abuse Registries;Due Process Implications of Governmental OccupationalBlacklisting, 92 Mich. L.Rev. 139, 172 n.238 (1993) (hereinafterPhillips Note) (citing Bishop v. Wood, 426 U.S. 341 (1976)). Second, the plaintiff must allege that the stigmatizing statement is false. Phillips Note 92 Mich. L.Rev. at 172 n.238 (citingCodd v. Velger, 429 U.S. 624 (1997) (per curiam)). with respect to the publication requirement, permitting access to a child-abuse registry by a prospective employer has been recognized as satisfying this condition. Phillips Note, 92 Mich. L.Rev. at 172 n.238 (citing Angrisani v. City of New York, 639 F. Supp. 1326, 1333 (E.D.N.Y. 1986). Moreover, the very fact that this action is being brought by Ms. Marold and her son establishes to this court's satisfaction that the plaintiffs dispute the veracity of the allegation.
Based on the foregoing analysis, it is established that Jason Marold possesses a constitutionally protected interest in his good name and reputation which was implicated when his name was included in the CANTS data system. The remaining question is whether the DCYF afforded Jason the appropriate procedural protections when it undertook to so identify him as a child molester. The next step of this analysis requires consideration of whether the CANTS procedural framework affords adequate safeguards against the improper deprivation of the liberty interest implicated here.
It is well settled that the Fourteenth Amendment to the United States Constitution Due Process Clause requires that an individual be provided adequate notice of state action taken against him or her. Mennonite Board of Missions v. Adams,462 U.S. 791, 795 (1983) (quoting Mullane v. Central Hanover Bank Trust Co., 339 U.S. 306 (1950)). Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential. Montaquila v. St. Cyr, 433 A.2d 206, 212 (R.I. 1981). This notice must be reasonably calculated under the circumstances to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections. Mullane v. Central Hanover Bank Trust Co.,339 U.S. 306, 314 (1950). Furthermore, the hearing process itself must contain adequate constitutional protections when striking the balance between the state's interest in achieving its objectives and the individual's private interest. Mathews v. Eldridge,424 U.S. 319, 335 (1976); Santosky v. Kramer, 455 U.S. 745-766 (1982); Valmonte v. Bane, 18 F.3d at 1003 (2nd Circuit 1994).
An examination of the record, as well as the DCYF policies and procedures in effect at the time, reveals that the DCYF had no procedural mechanism in place for notifying an individual of Jason Marold's status that his or her identity was to be included in a child abuse reporting system and would be disseminated to prospective employers should that individual seek employment in the child-care field. Nor did the DCYF have any procedure by which an individual of Jason Marold's status was to be afforded an opportunity to object to being included in the reporting system. Certainly, there is nothing in the record to indicate that Jason Marold was ever afforded such notice by the DCYF. As indicated earlier in this decision, but for the action taken against his mother's day-care license, the action taken by DCYF against Jason may well have gone undiscovered and unchallenged. To the extent that Jason Marold was afforded some opportunity to be heard within the context of his mother's license-revocation proceedings, this court concludes that the hearing did not contain sufficient constitutional protections so as to meet the requirements of due process.
The hearing afforded Jason Marold was deficient in two primary respects. First, the question considered by the hearing officer was whether the child protective investigator complied with departmental policy and procedures in conducting her investigation and not whether the allegations of sexual molestation were proved. Second, the hearing officer based her determination that the child protective investigator had indeed complied with departmental policies and procedures upon a "credible evidence" standard. By requiring that the child protective investigator's findings be supported merely by credible evidence of the investigator's compliance with departmental policies and procedures, the DCYF clearly violates the Fourteenth Amendment due process rights of any individual against whom it has made a finding or determination of abuse or neglect or of other harmful conduct perpetrated against a child.
The nature of the process due in a proceeding which results in identifying an individual as a perpetrator of child abuse or child sexual molestation turns on a balancing of three factors: the private interest affected by the proceedings; the risk of error created by the state's chosen procedure; and the countervailing governmental interest supporting the use of the challenged procedure. Mathews v. Eldridge, 424 U.S. 319, 335;Santosky v. Kramer, 455 U.S. 745, 755 (1981); Valmonte v. Bane,18 F.3d 992 (2nd Circuit 1994). In any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the public and private interests, but also a societal judgment about how the risk of error should be distributed between litigants. Santoskyv. Kramer, 455 U.S. at 757 (1981). The minimum standard is a question of federal law, the resolution of which is within the scope of this court's powers. See Santosky, 455 U.S. at 755-756 (1981). Retrospective case-by-case review cannot preserve fundamental fairness when a class of proceedings is governed by a constitutionally defective evidentiary standard. Santosky v.Kramer, 455 U.S. at 754-757 (1981).
The risk of error generated by the use of the credible evidence standard is compounded by the fact that, under DCYF policies and procedures, the focal issue becomes the child protective investigator's compliance with departmental policies and procedures as opposed to whether the alleged perpetrator indeed committed the acts in question. Because the DCYF policies and procedures limit the contest to one of whether the child protective investigator was correct in applying the appropriate policies and procedures, the hearing process inherently precludes the individual against whom the findings or determinations are made from directly contesting the merits of the allegations themselves. The effect is to deprive the individual whose conduct is at issue of any meaningful opportunity to challenge the merits of the findings or determination itself. By shifting the focus of the inquiry to the child protective investigator's process as opposed to the merits of the allegations, the DCYF leaves an individual bereft of a means to attack the substance of the finding against him or her. That the hearing officer in the instant case may have directed her own findings to the substance of the allegations and not merely the procedures upon which the findings were made is of little help since the credible evidence standard articulated in Policy 420 is constitutionally deficient as well.
The state's interests in establishing and administering the CANTS system are twofold. First, and most important, is the role of the state in protecting children from abuse. The state unquestionably possesses a strong interest in protecting children from the infliction of physical harm and from exposing them to the risk of sexual predators. Moreover, the state has a very real and appreciable interest in achieving economic efficiency while simultaneously administering the CANTS system, and any increasingly complicated procedural requirements necessarily increase the DCYF's administrative expenses.[4] See Valmonte,
18 F.3d at 1003; Dowling, 664 N.E.2d at 1251 (N.Y. 1996).
Because the government's interest in establishing and maintaining the CANTS system is compelling, as is the liberty interest of an individual implicated as a child abuser, a resolution of the requisite balancing test hinges upon the risk of error associated with a CANTS adjudication. Therein lies the constitutional flaw in the DCYF's administrative process, for the enormous risk of incorrect adjudication is unacceptable. The risk of an erroneous adjudication clearly tips the equation in favor of Jason Marold and drives this court's determination that any DCYF administrative process which fails to provide an individual with the opportunity to challenge the merits of the allegations against him and requires proof by something less than a preponderance of the evidence is unconstitutional. The unavoidable conclusion is that the DCYF hearing process was constitutionally inadequate and, as a result, Jason Marold was deprived by the DCYF of a constitutionally protected liberty interest.
With respect to Maryanne Marold and the license-revocation proceeding, the analysis is less complicated. It is well settled that the interest a licensee possesses in a governmental issued license is a protectable property interest. See, e.g., In ReJoseph Cross, 617 A.2d 97 (R.I. 1992) (bail bondsman's license);Fitzpatrick v. Pare, 568 A.2d 1012 (R.I. 1990) (driver's license);Leone v. Town of New Shoreham, 534 A.2d 871 (R.I. 1987) (moped rental license); Tillinghast v. Town of Glocester, 456 A.2d 781
(R.I. 1983) (campground owner's license). Courts have reasoned that the deprivation of this entitlement must comport with procedural due process because the continued possession of a license is in many cases essential to the pursuit of a livelihood. See Leone, 534 A.2d at 874. (Citation omitted.) That Maryanne Marold's continued possession of her day-care license was essential to her pursuit of a livelihood as a day-care provider cannot be seriously disputed. Therefore, Maryanne Marold is also deserving of constitutional due process protections. Furthermore, G.L. 1956 § 42-35-14 (c) requires that proceedings for the permanent revocation of licenses shall be promptly instituted and determined.
The hearing afforded to Maryanne Marold in April 1992 failed to respond to the due process requirements of the Fourteenth Amendment to the United States Constitution due process clause. While due process is not a fixed legal concept, it is well settled that some kind of hearing is required before a person is finally deprived of his or her property interests. Bell v. Burson, 402 U.S. 535, 542 (1971). In emergency suspension cases, a pre-termination hearing is not always required when a full and immediate post-termination hearing is available. Bionomic Churchof Rhode Island v. Ruscetta, 424 A.2d 1063, 1065 (R.I. 1981). Seealso, Barber v. Exeter-West Greenwich School Committee,418 A.2d 13, 20 (R.I. 1980). In the instant case, the record is clear. The DCYF suspended Maryanne Marold's day-care license on an emergency basis and, while that emergency suspension was in effect, it summarily undertook a permanent revocation of her license and did not provide her an opportunity to be heard until approximately six months later. While the DCYF acted appropriately in suspending Maryanne Marold's license on an emergency basis considering the serious nature of the accusations as well as the highly vulnerable nature of potential victims, there is no justification for the DCYF's failure to provide a hearing prior to the permanent revocation of Marold's license. To the extent that a timely post-deprivation hearing could have remedied the harm, that opportunity was lost as a result of the ensuing six-month delay occasioned by the DCYF. An essential element of any due process analysis is the opportunity to be heard at a meaningful time. Millett v. Hoisting Engineers LicensingDivision, 377 A.2d 229 (R.I. 1977). Where the license in question is essential to the pursuit of one's livelihood, a six-month delay in a post-deprivation hearing renders that hearing meaningless. Particularly in circumstances where the allegations and evidence in support of those allegations are of a nature as in the instant case. See Mills v. Howard, 280 A.2d 1091 (RI 1971). Moreover, a hearing instituted some six months after the deprivation can hardly be considered to be promptly instituted absent some exceptional circumstances. See G.L. 1956 §42-35-14 (c).
Furthermore, it is clear that the DCYF failed to comply with its own procedures governing license-suspension hearings. Policy 007, which was the policy in effect at the time, required that the hearing officer's determination be based on clear and convincing evidence. The hearing officer simply ignored the DCYF Policy 007 mandate in this regard. It is well settled that agency regulations have the force and effect of law and that agency action which is not in accord with its own regulations is not in accord with law. Robert E. Derecktor of Rhode Island, Inc. v.Goldschmidt, 506 F. Supp. 1059 (1980).
Because the foregoing analysis is dispositive of the questions presented by this case, the court does not reach the question of whether Maryanne Marold should have been allowed the opportunity to directly challenge the merits of the allegations themselves as opposed to the child protective investigator's compliance with departmental policies and procedures; whether the hearing officer articulated sufficient factual findings to support her conclusion; and whether the hearing officer's decision is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record.
Conclusion
The appeal of plaintiff Maryanne Marold is sustained for the reason that the final DCYF decision was made in violation of federal constitutional provisions, was made upon unlawful procedure, and was affected by other error of law including the DCYF's failure to follow its own policies and procedures.
The appeal of plaintiff Jason Marold is sustained for the reason that the final DCYF decision was made in violation of federal constitutional provisions and was made upon unlawful procedure.
Pursuant to G.L. 1956 § 45-35-15 (g) this case is remanded for the limited purpose of reinstating the license of Maryanne Marold and for expunging all departmental findings, including CANTS records, that Jason Marold was the perpetrator of acts of child abuse, including sexual molestation.
Counsel shall prepare an appropriate order for entry.
[1] A fictitious name for purposes of this decision.
[2] The DCYF has the authority to promulgate policies and regulations by virtue of G.L. 1956 § 42-72-5 (b)(5).
[3] Subsections A(1) and (2) of Policy 420 provide additional regulations and guidelines which a child protective investigator must follow in investigating a complaint or allegation of child abuse. The DCYF policies 040 through 640 provide additional criteria and guidelines for child protective services investigations of complaints of abuse or neglect.
[4] When the two state interests at stake involve the state's interest in preserving and promoting a child's welfare and a physical and administrative interest in reducing costs, a standard of proof more strict than a preponderance of the evidence is warranted. Santosky, 455 U.S. at 766 (decision made in the context of a parental-rights termination proceeding). Even though Santosky arguably involved a more serious proceeding having issues with an even greater impact upon a young child than that now before this court, the reasoning of the majority sheds light on the appropriate standard of proof to be applied in this instance.