DECISION
This matter comes before the court on plaintiffs appeal of a decision issued by the Department of Business Regulation (DBR or Department) revoking plaintiffs liquor license. The appeal is pursuant to § 42-35-15 of the Rhode Island General Laws.
 Facts and Travel
Bourbon Street, Inc., (Licensee) holds a Class B alcoholic beverage license issued by the defendant Board of License Commissioners of the City of Newport. The Licensee has held this license for about 27 years and has utilized the same in connection with the operation of certain establishments on William Street in the City of Newport. For at least the past 10 years, the Licensee has operated two separate and distinct establishments at said premises on William Street. Located on the first floor of this location is Sully's Sports Pub. The official maximum allowable capacity for Sully's is 80 persons. The other establishment known as Señor Froggs, is located on the second floor of the William Street building and has an official maximum capacity of 260 people.
In 1998 and 1999, the Licensee received numerous citations for violations of Title 3 of the Rhode Island General Laws in connection with activities occurring in or near these establishments. On August 29, 1998, the Licensee was cited for an overcrowding violation at Sully's Sports Bar. The City found that the establishment housed between 17 and 25 people over the 80-person limit. The City Board of License Commissioners suspended the Licensee's license for one week and imposed a $1,000 fine. In addition, the Licensee was fined $500 for this violation by the Newport Municipal Court.
On October 2, 1998, the Licensee was cited for an overcrowding violation at Señor Froggs with evidence showing that there were up to 70 more people present in that establishment than the 260 person limit. The City Board of License Commissioners imposed a two week suspension and a $1,000 fine. Additionally, the Newport Municipal Court issued a $500 like.
On October 11, 1998, the Licensee was cited again when two individuals were arrested outside Señor Froggs for disorderly conduct. On October 22, 1998, eighteen minors were apprehended for consuming alcohol and the Licensee was cited for underage drinking violations at Señor Froggs. The licensee was also cited for use of a promotion called the "bottomless cup. Under this promotion, entrants to Señor Froggs could pay a cover charge and obtain an unlimited number of drinks from 8:30 to 10:30 p.m without additional cost.
On November 14, 1998 the Licensee was cited for an incident involving a disorderly person on Williams Street. On November 22, 1998, the Licensee was cited for a violent altercation which took place outside Licensee's establishment and which included the assault on a. police officer.
On January 16, 1999 the Licensee was cited for an incident involving two individuals who had an altercation on Williams Street and then in the Bellevue Gardens parking lot. Three months later, on April 30, 1999, three underage individuals presented false identification and were allowed into the establishment.
On November 18, 1998, the City Board of License Commissioners voted unanimously to permanently revoke the Licensee's Class B alcoholic beverage license for both of its establishments.[1]
The Licensee appealed to the Department of Business Regulation pursuant to R.I.G.L. § 3-7-21, as amended. A hearing officer conducted a de novo hearing on January 26-28, 1999. During the post hearing period, but prior to the release of the decision by the Department of Business Regulation, the City moved to reopen the record to provide new evidence of additional Title 3 violations by the Licensee. The motion was granted and additional evidence was received at a hearing on Monday, May 10, 1999. The hearing officer issued his final decision on June 1, 1999 affirming the revocation of the License's Class B alcoholic beverage license for both establishments.
The instant appeal was filed. Plaintiff claims that the Department's decision violated its substantial rights and that the findings and conclusions of DBR are:
 (a) in violation of constitutional and statutory provisions; in excess of the statutory authority of the agency;
 (b) made upon unlawful procedure; affected by other error of law;
 (c) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; and
 (d) arbitrary and capricious and characterized by an abuse of discretion or clearly unwarranted exercise of discretion.
Plaintiff requests that this Court grant an Order staying the agency decision pending a determination by this Court, as well as a judgment reversing and for modifying the agency decision revoking plaintiffs license for both Sully's and Señor Froggs.
 Standard of Review
The review of a decision of the Board by this Court is controlled by G.L. 1956 (1993 Reenactment) § 42-35-15 that provides for review of contested agency decisions;
 "(g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure
 (4) Affected by error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion)"
This section precludes a reviewing Court from substituting its judgment for that of an agency regarding the credibility of witnesses or the weight of evidence concerning questions of fact. Therefore, this Court's review is limited to determining whether substantial evidence exists to support the Board's decision.Newport Shipyard v. Rhode Island Commission for Human Rights,484 A.2d 893 (R.I. 1984). `Substantial evidence' is that which a reasonable mind might accept to support a conclusion, i.e., more than a scintilla of competent evidence. Id. at 897. This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view evidence differently than did the Agency. The Court will `reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record'. Milardov. Coastal Resources Management Council, 434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody v. R.I. Conflict ofInterest Commission, 509 A.2d 453, 458 (R.I. 1986).
 The Record
The record presented to this Court for review includes a full transcript of the hearing before the Department of Business Regulation. In the first pages of that transcript, it becomes clear that the Licensee; is concerned not with the fact that it repeatedly committed a series of offenses involving overcrowding and underage drinking in its establishments. Rather, the Licensee argues that "these offenses do not amount to a situation in which a license should be revoked or a situation in which penalties of a week, plus two weeks for two isolated overcrowding incidents occurred" TR. at 19.
The Heating Officer heard substantial testimony regarding the night of October 22, 1998, when approximately 18 persons were arrested for underage drinking on the premises of Señor Froggs. Testimony was first given by Chief David Kelly, Chief of the Newport Police, Officer Bradford Connor and Sergeant Russell Carlone. All three of these individuals testified about their varying involvement with the investigation into underage drinking at Señor Froggs particularly on the night of October 22, 1998.
The Hearing Officer then heard the testimony of Allison Snow, a junior at Salve Regina University. Ms. Snow stated that though she was only 20 years old, she had been consuming alcohol at the bar on October 22. She also testified that she showed her own identification at the door, a license which revealed that she was in fact only 20 years old, but was not asked to sign the "minors book" that the bar purports to maintain. Ms. Snow also revealed that she has frequented Sully's Bar since her arrival at Salve Regina University.
 Q: Allison, Sully's, that's the place on the first floor in the same building as Señor Froggs, correct?
 A: Yes.
 Q; Can you estimate how many times you'd been in Sully's?
 * * *
 A: It's been a lot, I guess, because my roommate plays on a pool league.
 * * *
 Q: More than ten?
 A: Yes.
 Q: More than 20?
 A: Yes.
 * * *
 Q: How did you gain access to Sully's each time, did you use an identification card?
 A: Sometimes I just showed them my real license, like I did at Froggs, sometimes nothing.
 Q: Did you consume alcoholic beverages on the premises of Sully's?
 A: Yes.
 Q: How many times?
 A; Every time I went in there. TR., 114-115.
Ms. Snow was not the only student to testify about her presence at Sully's Bar or Señor Froggs either on the night of October 22 or at other times. The hearing officer next heard from an 18 year old freshman named Kim Combis. Ms. Combis said that on October 22, she arrived at Señor Froggs, showed a false identification, paid five dollars and received the "bottomless cup" which would allow her to drink all she wanted until 10:30 p.m. Ms. Combis stayed until she was apprehended, around 11:00p.m. By that time, she said, she had consumed one or two beers. TR., 124-129.
Erin McSweeney, a 19 year old freshman testified that she not only patronized Sully's and Señor Froggs, she was employed at the latter establishment as a "shot girl."
 Q: Now, tell me what a shot girl does?
 * * *
 A: We're walking around, we come up and we sell shots of different kinds of alcohol. There's different things you do on different nights. One night you can be a cocktail waitress, where you walk around and just ask people what they want, other nights you sell shots out of bottle, there's the test tube shots.
 * * *
 Q: Now, while you were working there, did you ever consume any alcoholic beverages?
 A: While working, yes.
 Q: Okay. Yes. How did you get the alcoholic beverages?
 A: A lot of times when you're working, like, say, this normally happens on test tube shots, I'll buy a shot if you take a shot, but totally not, like, you know, allowed to do. I mean, its not like I'm given permission, that we're allowed to drink.
 * * *
 Q: How did you get the job at Señor Froggs?
 A: I was aware of it by, there was a flyer, you know, interested in hiring cocktail waitresses.
 Q: How did you get the flyer?
 A: It was put under my door at school.
 Q: Slipped under your door at school?
 A: Yes.
 Q: What did the flyer say?
 A: It said looking for, like, cocktail waitresses to work at Señor Froggs, and it left a number where to call, and if you were interested, you called it.
 Q: Tell me, in the dormitory that you were living, what's the name of it?
 A: Reefe Hall.
 Q: What's the makeup of students in there, when I was in college, you know, they had the freshman dorm, the sophomore dorm, the junior dorm, like that, and then everybody split off campus, what's Reefe Dorm?
 A: Reefe Dorm is an all girls' dorm, and, it ranges from freshman, there are, I believe, a couple of seniors in it.
 Q: A couple of seniors in it. Is it predominantly freshmen, would you say?
 A: Freshmen and sophomores. TR., 217-220.
One after another, over ten students, under the age of 21 testified that they frequented Sully's and/or Señor Froggs. Many presented false identification but others showed their true licenses and were allowed into the establishments. These students were not "first-timers," they repeatedly entered these bars, most often in order to obtain alcohol. And, according to the testimony, the alcohol flowed freely despite their ages.
Mr. William Clark, one of the owners of Bourbon Street, Inc. was called to testify about the policies implemented at Señor Froggs and Sully's for checking identification before allowing people into these establishments.
 Q: What do those doormenlook for when they check an identification?
 A: Well, basically, they're looking for excessive drinking or any problematic people upstairs. They're keeping their eyes roaming at all times.
 Q: And the doormen downstairs now, what would they look at if they're looking at an identification card, what are the things that they would look at?
 A: As far as the IDs are concerned, they are going to check out the obvious, the eyes, weight the height, the date of birth.
 Q: Expiration date?
 A: Expiration.
 Q: Evidence of alteration?
 A: Yes.
 Q: And if they look at one of these ID cards and they see something suspicious, what else might they do in terms of talking to the person who's presenting the ID?
 A: They will speak with the person to try to identify more information coming from the ID or from them. At that point, if, you know, they're satisfied wit that, then the IDs will be either put into the minor book, just as a system of double checks. TR., 358-359.
Mr. Clark also testified about the various citations for overcrowding. TR, 460, 463, 486, 487.
The numerous witnesses and the thoroughness of their testimony resulted in an eight hundred page transcript. The testimony recorded there is cited throughout the twenty five page decision issued by the Department of Business Regulation. Given the volume of testimony, the number of witnesses, and the thoroughness of the Department's decision, it is redundant and needless to recount all the testimony presented.
 The Department's Decision
In its decision, the Department cites Santos v. Smith,99 R.I. 430, 208 A.2d 524 (1965), for support. Santos seems to set the standard against which underage drinking violations can be measured. As is stated in the Department's decision, the facts presented by the instant case surpass those enumerated by Santos. Even if the presence of underage drinkers was not the result of intentional disregard for the law, and this Court is not so convinced, the repeated admittance of such a high number is at least the result of sheer negligence. Perhaps the most egregious example of this negligence is the employment of an underage college student in the capacity of "shot girl." This girl testified that she often drank hard liquor while on duty at Señor Froggs.
 "Other matters of aggravation surround this Licensee in the area of underage drinking. Procedures employed by the Licensee to monitor the potentiality of underaged drinking were insufficient, resulting in Title 3 violations. For example minor book procedures employed were far short of Title 3 requirements, specifically R.I.G.L. § 3-8-6, if existent at all in many situations. Clark claimed he followed minor book procedures and that there were 22 signatures in the minor book for October 22. However, the testimony from the underage individuals involved in the October 22 incident who were asked about whether they signed a minor book to gain entry reveals only 1 of the 7 responding positively to signing a minor book. When asked if they had signed a minor book on their previous visits to Froggs, the majority said they did not. Months later, two of the three underage girls who consumed alcohol at Froggs on April 30 testified that they did not sign a minor book the third was simply not asked the question at the hearing. Title 3 requires the diligent use of a minor book. The record reveals the Licensee falls short in this area." Decision 17.
The egregious nature of the aforementioned violations certainly reach, and in fact surpass, the level of severity articulated in Santos. However, as the record evidences and the Department's decision references, these establishments consistently violate regulations regarding the maximum capacity limits. Further, both Sully's and Froggs have become known for the numerous and frequent problems with "disorderly incidents resulting in assaults on patrons and police officers, impassible public streets and the draining of Police resources from other City locations." Decision 19.
As the Department pointed out in its decision, the citations for overcrowding which played a role in the decision to revoke the licenses of these two establishments were not first offenses. The Licensee had previously been cited for overcrowding in April 1997.
It has become clear that "[t]he Licensee has either deliberately ignored this warning or simply cannot employ practices, procedures or personnel capable of conforming within the confines of the law." Decision 19.
 Hearing Officer Greer: The overcrowding at Señor Froggs on October 2nd, where there was, I've got, I think it was maybe 70 persons or so in excess of capacity, more or less?
 Mr. Nicholson: Yes.
 Hearing Officer: Do you feel comfortable characterizing that in one way or another, that particular type of incident, not the fact that they were moving outside or anything that's another issue, but I'm trying to figure out whether you consider that to be a mild, a moderate, severe, don't let me put words in your mouth, but how would you describe that?
 Sargent Bartis: Well, when you have 70 additional patrons that may or may not be intoxicated, I would say you have a severe situation, that eventually would spill out into the City street's sidewalks and ten it now becomes my problem.
However, this concern expressed by Sargent Bartis regarding the increased number of patrons was not shred by co-owner Mr. Clark
 Q: In your estimation, we understand that there was approximately 70 more people in here than are allowed by your capacity limit. Was that a dangerous situation, in your estimation, based on the amount of floor space?
 A: In my estimation, no.
Perhaps the overcrowding cannot always be attributed to the repeated incidents of disorderly conduct to which the Newport Police are continually attending outside Sully's and Froggs, however; both conditions exist too frequently. "From October 11, 1998 to January 16, 1999, the record reveals 4 different disorderly incidents, at least some of which were not only in violation of R.I.G.L. § 3-5-23 but also in violation of this Office's stay provisions and accompanying warnings. This is farther evidence of a licensee out of control" Decision, 19.
 "This catalog of chaotic disorderly incidents, combined with the overcrowding violations, the widespread serving to underage individuals, the lax procedures in place addressing underage drinking, and the irresponsible, illegal promotion lead the undersigned to categorize the sum total of violations surrounding this Licensee as sufficiently severe to be worthy of license revocation. No city or town need endure such a business." Decision 20.
Under the standard governing this Court's review of the Department's decision, the Department is due the greatest of deference. Absent some evidence of an abuse of power or error of law, this Court is duty bound to uphold the Department's findings. In reviewing the entire record this court finds no error on which reversal is warranted. Neither, is there any competent reason for a stay to be issued in this matter. To the contrary, there is ample substantial evidence to support the decision. This Court agrees with the Department's assessment of the violations and deems the license revocation a justifiable consequence. Accordingly, the plaintiffs motion for a stay is denied and the decision affirmed.
Counsel shall prepare and submit the appropriate judgment.
[1] Originally, the Licensee was granted a stay of the Board's decision but this stay was lifted on May 10, 1999 and both establishments were closed.