[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
On October 20, 2004, the Board of Medical Licensure and Discipline and Patricia A. Nolan, M.D., in her capacity as the Director of the Department of Health, (hereinafter collectively referred to as "Defendants") issued an Administrative Decision and Order disciplining Claude E. Younes, M.D. (hereinafter "Dr. Younes" or "Appellant") for "unprofessional conduct" within the meaning of G.L. 1956 § 5-37-5.1
(19). Specifically, the Order required Dr. Younes to, within four weeks of the issuance of the Order, enroll in the Colorado Physician Evaluation Program, or such equivalent program as may be approved by the Board. Appellant is now appealing that decision. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 FACTS AND TRAVEL
Dr. Younes is a physician duly licensed to practice medicine in the State of Rhode Island. Beginning in 1998, Dr. Younes began to treat a sixty-two year old female patient (hereinafter "Patient A"). Subsequent to a June 3, 1999 visit with Dr. Younes, Patient A was diagnosed with metastatic carcinoma and, thereafter, filed a complaint against Dr. Younes with the Board of Medical Licensure and Discipline.
The Specification of the Charges and Time and Notice of Hearing informed Dr. Younes that a hearing would be held on September 11, 2002 on the question of whether his license as a physician in the State of Rhode Island should be revoked or suspended or why he should not otherwise be disciplined. The Defendants alleged that Dr. Younes was guilty of unprofessional conduct by reason of negligence in his diagnosis, evaluation and treatment of Patient A. Further, Defendants alleged that he failed to make, record and document needed clinical findings on June 3, 1999, constituting grounds for the imposition of disciplinary sanctions pursuant to § 5-37-5.1(19).
A three-member Hearing Committee met on the matters contained in the Specification of Charges on September 11, 2002. Additional hearings were convened on July 23, 2003 and June 29, 2004. All parties were represented by counsel. At the hearing conducted on the merits, the attorney for the Board solicited testimony from three witnesses for the State and examined Dr. Younes as an adverse witness. Dr.Younes' attorney cross-examined the State's witnesses and examined Dr. Younes. Sixteen exhibits were entered into the record.
The first person to testify was the son of Patient A (hereinafter "John Doe") on September 11, 2002. He testified concerning his mother's complaints in 1999 involving pressure and soreness in her neck, her shoulder and her head and stated that she had complained to him about a lump in her neck. (Tr. 9/11/02 at 11-13.) He stated that his mother told him that she had complained about the lump in her neck to the doctor and that the doctor told her it was a pulled muscle. (Tr. 9/11/02 at 18.) John Doe testified that when he himself put his hand on his mother's neck, he felt "a very large lump" and "it was very bumpy." (Tr. 9/11/02 at 18.) He continued on to state that, "behind the ear, like up in the back under part of her neck, there was a large lump there," and testified that it was on the right side. (Tr. 9/11/02 at 19.) He further testified that his mother told him that the doctor did not touch it, and that upon hearing this he advised his mother to get a second opinion. (Tr. 9/11/02 at 19-20.) On cross-examination, John Doe testified that his mother was frustrated that Dr. Younes had not examined the lump. (Tr. 9/11/02 at 32.)
The second person to testify at the hearings was Dr. Younes, who was called as an adverse witness by the Board's attorney on September 11, 2002. The medical record of Patient A was introduced as Exhibit 5. Dr. Younes noted a first visit on January 23, 1998 and also noted that a problem list was created, but did not put any of the interim dates between January 23, 1998 and April 16, 1998 on the problem list because he said the problem list did not change. (Tr. 9/11/02 at 52.) There were no visits between October of 1998 and April of 1999. (Tr. 9/11/02 at 60.) Although the notes for April 16, 1999 showed that the nurse wrote "cervical pain," Dr. Younes himself did not document anything with respect to the neck on that April visit. (Tr. 9/11/02 at 61.) There was a span from October 1998 through April 1999 (six months) in which Dr. Younes did not do a detailed exam, as he testified that if he had, he would have documented it. (Tr. 9/11/02 at 65.)
On the issue of cervical pain, there was no reference to anything addressing the subject of cervical pain in Dr. Younes' notes. (Tr. 9/11/02 at 65-67.) Dr. Younes admitted that you could not tell whether Patient A had a complaint of pain that day or if it was a complaint of past cervical pain. (Tr. 9/11/02 at 67.) He stated that it could have meant yesterday, last week or last month. (Tr. 9/11/02 at 68.) Dr. Younes testified that Patient A's blood pressure has been going up from 140 on October 29, 1998 to 160 on April 16, 1999. (Tr. 9/11/02 at 75.) He testified that on June 3, 1999 the blood pressure was 174 over 82 (Tr. 9/11/02 at 76), and that complaints to the nurse showed pain of the head radiating down the right face and neck. (Tr. 9/11/02 at 77.)
The cross-examination of Dr. Younes, as well as the direct examination of Dr. Younes, was continued to June 29, 2004. Dr. Younes admitted that he did not document whether or not the patient had cervical pain at the time of the June 3, 1999 visit. (Tr. 6/29/04 at 7.) With respect to negative pertinent findings, he said that he didn't document negative findings if at the time it was not a complaint to him. (Tr. 6/29/04 at 7-8.) With regard to the June 3, 1999 visit, Dr. Younes stated that he discussed with Patient A the type of headache she had, its severity, and if there were any other symptoms associated with it, but that he did not document any of this information. (Tr. 6/29/04 at 23.) He stated that usually he would touch the face of a person with headaches, but admitted that there was no indication in his records that he touched the face of Patient A on that particular day. (Tr. 6/29/04 at 24.) He agreed that looking at his records there was nothing to show that he examined her head outside of the evaluation at the end relating to the question of stress associated with a headache. (Tr. 6/29/04 at 26.) Dr. Younes also agreed that that was an assessment rather than an evaluation. (Tr. 6/29/04 at 26.) Dr. Younes further conceded that there was nothing in the records to show that an examination of the head, the face or the neck was done. (Tr. 6/29/04 at 26-27.) He said that he did not discuss with Patient A any problem regarding a muscle in her neck. (Tr. 6/29/04 at 27.) He also testified that Patient A never complained about a lump on the side of her neck. (Tr. 6/29/04 at 28.) When asked about palpating the side of her neck to look for a lump on June 3, 1999, he stated that when you do an examination, you do touch the posterior aspect of the neck to see if there is any tension headache. (Tr. 6/29/04 at 28.) However, Appellant admitted that his examination was restricted in the back and didn't come forward towards the side at all. (Tr. 6/29/04 at 29.) Dr. Younes stated that he never touched anything under the jaw. (Tr. 6/29/04 at 30.) With respect to negative findings concerning lymph glands and lymph nodes, Appellant admitted that there was nothing in his records. (Tr. 6/29/04 at 30-31.) Appellant stated that he did not remember whether he palpated Patient A's neck on the visit of April 16, 1999, the day that the nurse noted cervical pain. On June 9, 1999, Dr. Younes' explanation for the lump was that after stopping the Prednisone Patient A had a flare-up of the lymph nodes. (Tr. 6/29/04 at 45.)
The third person to testify, on September 11, 2002, was Dr. Stephen John D'Amato ("Dr. D'Amato), a Board certified emergency medical physician who saw Patient A at his North Providence medical services facility on June 9, 1999, six days after her last visit to Dr. Younes. Dr. D'Amato's medical record of Patient A was introduced as Exhibit 6. There was a notation in the record about a "lump behind the right ear" that was typed by the receptionist. (Tr. 9/11/02 at 81.) The nurse's note in the record, after the signature R.N., said in part, "c/o nausea, lump behind right ear, no appetite, no taste, increased mucous. . . ." (Tr. 9/11/02 at 82.) Dr. D'Amato noted a firm mass on the right angle of the mandible and sternocleidal mastoid muscle. (Tr. 9/11/02 at 86.) The record also noted a "large hard matted area right neck." (Tr. 9/11/02 at 87.) Dr. D'Amato stated that the mass was like a hard congealed type. (Tr. 9/11/02 at 90.) Dr. D'Amato further described the mass as being found right at the point where the jaw makes the curve. In describing painful glands in the neck, Dr. D'Amato testified as follows:
 "The nurse's note, it says, `lump behind the right ear'; and then my note below it says, `painful glands in the neck.' It's very common for patients to come in when they have got a lump, they call this behind the ear. You see that all the time."
The fourth person to testify was Dr. Paul J. Agatiello (Dr. Agatiello). Dr. Agatiello, whose curriculum vitae was admitted as Exhibit 9, was Board certified in internal medicine and testified as an expert on July 23, 2003. Before testifying, Dr. Agatiello reviewed the specification of charges, the testimony of John Doe and the direct examination of Dr. Younes, up to the point where he left off on September 11, 2002. Dr. Agatiello also reviewed the testimony and medical records of Dr. D'Amato. In addition to the above, he reviewed the office and progress notes of Dr. Younes, the pathology reports and other medical data.
A page from Harrison's Principles of Internal Medicine 10th Edition
was made Exhibit 11 in the case. Dr. Agatiello went into detail in describing inadequate documentation on the part of Dr. Younes with respect to the treatment of June 3, 1999. (Tr. 7/23/03 at 23-28.) With respect to documentation, he stated that students are taught that if it's not written, it's not done. In support of this, he referred to the page in Harrison's Principles of Internal Medicine pertaining to the "history" and "physical" parts of the text. (Tr. 7/23/03 at 29.) Those sections clearly provide that the written history of an illness should embody all the facts of medical significance in the life of the patient. The results of the physical examination, like the details of the history, should be recorded at the time they are elicited rather than hours later when they are subject to the distortions of memory. Dr. Agatiello based his testimony upon his education, training and experience, and cited the medical text as additional support.
Dr. Agatiello testified that based on a review of Appellant's records, Appellant did not examine the head, face or neck of the patient on June 3, 1999, and if he did, then it was not documented in the record. Dr. Agatiello noted numerous instances where Appellant failed to use the degree of skill and care expected of a reasonably competent practitioner in the same class in which he belonged, acting in the same or similar circumstances. Dr. Agatiello noted numerous instances where Appellant failed to adhere to the standard of care and testified that Appellant was negligent in his treatment of Patient A. (Tr. 7/23/03 at 44-45.) Additionally, Dr. Agatiello testified that Prednisone would have not had any effect on the patient's condition from the time that she saw Appellant on June 3, 1999, and the time that she saw Dr. D'Amato on June 9, 1999.
On October 20, 2004, the Board of Medical Licensure and Discipline and Patricia A. Nolan, M.D., in her capacity as the Director of the Department of Health, issued an Administrative Decision and Order. The Order reprimanded Dr. Younes and ordered him, within four weeks of the issuance of the Order, to enroll in a program approved by the Board which would evaluate Dr. Younes' fitness for continuation in the practice of medicine. The Board's Order further stated that if, as a result of the evaluation, there were recommended limitations, restrictions, terms or other conditions applied to Dr. Younes' license, they would be reviewed by the Board.
 STANDARD OF REVIEW
This Court is granted jurisdiction to review final orders of the Board of Medical Licensure and Discipline pursuant to § 42-35-15 of the Administrative Procedures Act. Specifically, this Court's scope of review is governed by § 42-35-15(g), which provides:
 "(g) The court shall not substitute its judgments for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or [sic] law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
A reviewing court will give great deference to an agency's final decision. Blackstone Valley Electric Co. v. Public Utilities Commission,543 A.2d 253 (R.I. 1988). The Court's review is limited to a determination of whether substantial evidence existed to support the Board's decision. Newport Shipyard v. R.I. Comm'n for Human Rights,484 A.2d 893 (R.I. 1984). "Substantial evidence" has been defined by the court to mean that which "a reasonable mind might accept to support a conclusion." Id. at 897 (quoting Caswell v. George Sherman Sand GravelCo., 424 A.2d 646, 647 (R.I. 1981)). The Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal Res.Mgmt. Council, 434 A.2d 266, 272 (R.I. 1971). However, questions of law determined by the administrative agency are not binding upon the court and may be freely reviewed to determine the relevant law and its applicability to the facts presented in the record. Carmody v. RhodeIsland Conflict of Interest Commission, 509 A.2d 453, 458 (R.I. 1986).
Analysis of § 5-37-5.1(19)
Appellant first argues that the Board's decision should be reversed because none of the expert testimony presented during the hearings concerned the minimal standards of acceptable and prevailing medical practice as defined in § 5-37-5.1(19). It is Appellant's position that Dr. Agatiello's expert testimony related only to the standard of care applied in civil tort actions and, therefore, the Board erred in using Dr. Agatiello's testimony to make a determination regarding Appellant's conformity with "minimal standards of prevailing and acceptable medical practice." Accordingly, Appellant maintains that there was not substantial evidence on the record to support the Board's decision that Appellant committed negligent conduct under § 5-37-5.1(19). This Court disagrees.
Section 5-37-5.1(19) of the Rhode Island General Laws provides that the definition of unprofessional conduct encompasses:
 "Incompetent, negligent, or willful misconduct in the practice of medicine which includes the rendering of medically unnecessary services, and any departure from, or the failure to conform to, the minimal standards of acceptable and prevailing medical practice in his or her area of expertise as is determined by the board."
In the instant case, there was abundant evidence presented during the hearings to support the Board's conclusion that Appellant engaged in negligent misconduct in his care of Patient A. It is clear from the testimony of Patient A's son, Dr. D'Amato, and Dr. Agatiello that Appellant was grossly negligent in the documentation and keeping of Patient A's medical records and that he failed to document the lump of which Patient A complained. Moreover, Dr. Younes himself admitted that he did not touch under Patient A's jaw, didn't remember if he palpated underneath the ear, and had nothing in his notes regarding negative findings concerning Patient A's lymph glands and lymph nodes. Additionally, despite Appellant's contention that Patient's A's discontinuation of Prednisone after she left Appellant's care affected the size of Patient A's lump, the evidence in the record indicates otherwise. Dr. Agatiello was very clear in his testimony that the cancerous, large, hard, matted area would not have changed in size in the six-day period between June 3, 1999 and June 9, 1999, regardless of whether or not Patient A discontinued taking Prednisone.
Furthermore, Appellant's argument that subsection (19) of the statute cannot be used to charge negligent misconduct because that section is restricted to either "medically unnecessary services" or "a departure from minimal standards of prevailing and acceptable medical practice" is unpersuasive. The fact that the statute states that medically unnecessary services or a departure from minimal standards are included in incompetent, negligent or willful misconduct in no way restricts the statute to these two types of unprofessional conduct. The Appellant asks this Court to distinguish the word "includes" from the phrase "including but not limited to," in order to preclude the Board from considering other forms of negligent conduct when applying § 5-37-5.1(19). However, the interpretation which Appellant suggests is inconsistent with the plain and ordinary meaning of the word "includes." Black's LawDictionary, Seventh Edition, states the following with respect to the meaning of the word include:
 "vb. to contain as a part of something. The participle, including typically indicates a partial list the plaintiff asserted five tort claims, including slander and libel. But some drafters use phrases such as including without limitation and including but not limited to — which mean the same thing. Cf. NAMELY." BLACK'S LAW DICTIONARY 766 (7th ed. 1999).
Based on the clear and unambiguous language of § 5-37-5.1(19), this Court finds that the Board did not err in finding that Appellant committed negligent misconduct under § 5-37-5.1(19).
Constitutionality of Treating Inadequate Record Keeping as Negligence
Appellant also argues that the Board is unconstitutionally creating an entirely new definition of unprofessional conduct by treating inadequate recordkeeping as unprofessional conduct. Appellant maintains that because "inadequate recordkeeping" is not specifically listed as a form of unprofessional conduct in § 5-37-5.1, a doctor cannot be subject to discipline on that basis, and as such, an application of § 5-37-5.1
"would run afoul of the due process clause of the Fourteenth Amendment to the U.S. Constitution."
Section 5-37-5.1 provides that "The term unprofessional conduct as used in this chapter includes, but is not limited to, the following items or any combination of these items and may be further defined by the regulations established by the board with prior approval of the director." Based upon this clear and unambiguous language, it is apparent to this Court that unprofessional conduct "is not limited to" the specific items listed in § 5-37-5.1 and can be fairly interpreted to include inadequate recordkeeping. Moreover, this Court finds Appellant's argument that it is unconstitutional to discipline him for inadequate recordkeeping when he was not aware that such conduct constituted unprofessional conduct defies common sense. Appellant should have been aware that failure to properly document a patient's medical condition is grossly negligent behavior and constitutes unprofessional conduct. The notion that "inadequate recordkeeping" has to be specifically listed as a form of unprofessional conduct in order to hold a physician accountable for such behavior is extremely disturbing and unsupported by the language of § 5-37-5.1.
While the Rhode Island Supreme Court has not had the opportunity to specifically address this issue, courts in other jurisdictions have held that the term "unprofessional conduct" is not unconstitutionally vague and gives sufficient notice to physicians. In Halter v. State of Alaska,Department of Commerce and Economic Development, Medical Board,990 P.2d 1035 (Ala. 1999), the Supreme Court of Alaska held that failure to chart and document in specific patient files were grounds to sanction a physician for professional incompetence, despite the fact that there were no specific regulations about record keeping in the State of Alaska at the time of the physician's conduct.
Similarly in Bogdan v. New York State Board for Professional MedicalConduct, 195 A.D.2d 86 (N.Y.App. Div. 1993), the Court held that where there is a relationship between inadequate recordkeeping and patient treatment, the failure to keep adequate records may constitute negligence. In that case, a physician was charged by the New York Board with failing to document information in the medical records of patients. The court found that failing to document information in the medical records of certain patients was a ground for professional misconduct under the specification of negligence and sustained the finding of negligent conduct amounting to professional misconduct.
In the instant case, there was no reason for Appellant to believe that he would not be subject to discipline if he was negligent in the keeping of a patient's medical records. The fact that a physician has a responsibility to keep accurate and complete medical records for their patients is not a novel concept. Furthermore, here there is a state statute directly stating that a physician can be subject to discipline for negligence. Consequently, Appellant's argument that it is unconstitutional to consider inadequate record keeping a form of unprofessional conduct under § 5-37-5.1 is without merit.
Additionally, Appellant's assertion that he cannot be found guilty of unprofessional conduct because of the amendment to § 5-37-5.1(28) enacted on July 17, 2003 is unavailing. The statutory amendment upon which Appellant relies changed the definition of unprofessional conduct from "medical malpractice" to a "pattern of medical malpractice." However, subsection (19) of the statute, under which Appellant was disciplined, was repeated verbatim in the statutory amendment. Furthermore, Appellant's unprofessional conduct occurred in 1999, the Specification of Charges were served in 2002, and testimony in the case began on September 11, 2002, all before the amendment of subsection 28 was enacted on July 17, 2003.
Appellant asks this Court to apply the 2003 amendment of subsection 28 to his 1999 negligence, claiming that ameliorative amendments to punitive statutes should be applied if the decision making body has not yet come to a final judgment. Here, however, the statute under which Appellant was charged was not a punitive statute. These hearings were not criminal in nature, but rather were disciplinary hearings designed to protect the public from doctors whose conduct has been deemed unprofessional. See Lisiv. Bashaw, 599 A.2d 1038, 1040 (R.I. 1991) (holding that disciplinary hearings dealing with an attorney's professional conduct were civil in nature rather than punitive). Accordingly, this Court finds Appellant's argument to be without merit.
Application of G.L. 1956 § 5-37-5.1(9)
Appellant further contends that at the time Patient A was treated in June of 1999 G.L. 1956 § 5-37-5.1(9) was the exclusive statutory or regulatory provision that addressed a physician's responsibilities with respect to maintaining patients' medical records. It is Appellant's position that because he was not charged with "willfully omitting to file or record" as is prohibited under § 5-37-5.1(9), he could not be charged under § 5-37-5.1(19) for such conduct.
Appellant's argument ignores the fact that he was not charged with willfully omitting to file or record but rather was charged with "negligent conduct" as is prohibited under §§ 5-37-5.1 and 5-37-5.1(19). The Board, in accordance with the statute, found that unprofessional conduct included negligence with regard to inadequate recordkeeping. Thus, Appellant's contention that he could only be charged with inadequate record keeping under § 5-37-5.1(9) is unpersuasive, as it ignores the fact that Appellant was charged with negligence in recordkeeping as opposed to willfully omitting to file a record.
Impact on Patient Care
Finally, Appellant asserts that his recordkeeping did not impact patient care and, therefore, cannot serve as a foundation for the imposition of discipline. According to Appellant, the Board may not make a finding of negligent misconduct in the practice of medicine in connection with inadequate recordkeeping unless it first concludes that the improper recordkeeping adversely affected patient care. Appellant maintains that because Patient A's treatment was not affected by Appellant's recordkeeping practices, the Board erred in imposing discipline on Appellant.
As stated previously, these hearings are civil in nature and are designed to protect the public from doctors who exhibit unprofessional conduct. Even if Appellant's inadequate recordkeeping practices were not proven to have had a detrimental impact on Patient A's treatment, the question for the Board was whether Appellant's conduct was unprofessional. Here, the Committee's expert, Dr. Agatiello, testified that Appellant's inadequate documentation "caused a lot of difficulty for [him] in looking at the transcript and looking at what was actually done in [the] office." Moreover, the Board found that Appellant's "failure to properly assess the patient and order diagnostic testing for her resulted in his failure to recognize her cancer and to make a proper referral for treatment of that condition."
After reviewing all of the testimony and the Board's decision, this Court finds that Appellant's inadequate recordkeeping practices were unprofessional and that this is precisely the type of unprofessional conduct that § 5-37-5.1 was designed to protect against. The fact that Appellant's conduct may not have adversely impacted Patient A's treatment because Patient A sought a second opinion immediately after her visit with Appellant does not mitigate or excuse Appellant's unprofessional conduct. Section 5-37-5.1(19) expressly states: "The board need not establish actual injury to the patient in order to adjudge a physician or limited registrant guilty of the unacceptable medical practice in this subdivision." In the present case, the Board imposed a conservative form of discipline by requiring the Appellant to enroll in a program which would evaluate Appellant's fitness for continuation in the practice of medicine. Additionally, the Board stated in its decision that if any limitations, restrictions or other conditions were applied to Appellant's license as a result of the evaluation, such action would be reviewed and acted upon by the Board. Consequently, this Court finds that the Board did not err in imposing discipline on Appellant and that the discipline imposed by the Board was appropriately tailored to address the Appellant's unprofessional conduct.
 CONCLUSION
This Court finds that the Board's decision to discipline Appellant for unprofessional conduct pursuant to § 5-37-5.1 and § 5-37-5.1(19) was supported by substantial evidence in the record and is consistent with the plain and ordinary language of the statute.
For the foregoing reasons, this Court affirms the Board's Administrative Decision and Order.
Counsel shall prepare a judgment for entry in conformity with this decision.